No. 88-381 $\beta$

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

HELENA ELEMENTARY SCHOOL DISTRICT NO. 1 AND HIGH SCHOOL
DISTRICT NO 1 OF LEWIS & CLARK COUNTY; BILLINGS ELEMENTARY
SCHOOL DISTRICT NO 2 AND HIGH SCHOOL DISTRICT NO 2 OF
YELLOWSTONE COUNTY; et al.,
           Plaintiffs and Respondents,
      and
MONTANA EDUCATION ASSOCIATION et al.,
           Intervenors/Plaintiffs and Respondents,
      -vs-
THE STATE OF MONTANA; and THE MONTANA BOARD OF PUBLIC EDUCATION;
and THE MONTANA SUPERINTENDENT OF PUBLIC INSTRUCTION,
           Defendants and Appellants,
      and
C. J. HOLJE,BERNT WARD and ROBERT FREDERICH on behalf of the residents
and taxpayers of Sheridan County, Montana, and all others similarly
situated,
           Intervenors/Defendants and Appellants
HAYS-LODGE POLE ELEMENTARY SCHOOL DISTRICT NO 50 AND HIGH SCHOOL DISTRICT
NO 50, AND BLAINE COUNTY; et al. and the ASSOCIATION OF INDIAN IMPACT
SCHOOLS OF MONTANA,
           Intervenors/Defendants and Appellants


APPEAL FROM:   The District Court of the First Judicial District,

               In and for the County of Lewis and Clark,
               The Honorable Henry Loble, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:
            Terry G. Spear, Crowley Law Firm, Billings, Montana
            Hays-Lodge Pole School Dist #50, et al.
            Beda Lovitt, Helena, Montana, Montana Superintendent of
            Public Instruction
            Benjamin Hilley, Hilley & Loring, Bigfork, Montana
            for Montana Education Association
            Hon. Marc Racicot, Attorney General, Helena, Montana
            Clay R Smith, Assistant Attorney General, Helena, for
            State of Montana
            W. William Leaphart, Helena, Montana
            Loren O'Toole, Plentywood, Montana
            Donald A. Garrity, Helena, Montana

For Respondent:
   James H. Goetz, Goetz, Madden & Dunn, Bozeman, Montana

For Amicus Curiae:
   Charles E. Erdmann, Helena, Montana
   Bruce W. Moerer, Helena, Montana
   Dennis Lopach, Helena, Montana

Submitted: January 13, 1989

Decided: February 1, 1989

Filed:

Clerk

FILED
'89 FEB 1 PM 12 49
ED SMITH, CLERK
MONTANA SUPREME COURT

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

In this action for declaratory judgment, plaintiffs challenge the constitutionality of the 1985-86 method of funding public elementary and secondary schools in the State of Montana. The District Court for the First Judicial District, Lewis and Clark County, ruled in its primary holding that the system of funding violated the 1972 Montana Constitution. We affirm the holding of unconstitutionality, although on a narrower ground than that used by the District Court.

The issues upon which we decide this case and our conclusions are:

1. Does Montana's system of funding the public schools violate the education article, Art. X, of the Montana Constitution? We conclude that the system of funding does violate Art. X. We do not find it necessary to consider the equal protection analysis under Art. II, Sec. 4, of the Montana Constitution.

2. Should this Court clarify the District Court's findings regarding the accreditation standards promulgated by the Montana Board of Public Education? We conclude that some clarification is required.

3. Did the District Court err in its findings and conclusions relating to consideration in the equalization process of federal "874" funding? We affirm the holding of the District Court that Montana presently may not factor "874" revenue into the equalization formula because our system does not meet the federal definition of an equalized program. In its review of Montana's system of funding for public schools, the Legislature may desire to review the nature and extent of "874" funding, even though it may not in

any manner factor that into an equalization formula without meeting federal requirements.

4. Did the District Court err in denying plaintiffs' attorney fees? We affirm the denial of attorney fees.

In the 1985-86 school year, there were 545 school districts in Montana with a total student enrollment of 153,869. These included 382 elementary and 163 secondary districts. Nearly 45% of Montana schools have enrollments of less than 100 students.

The six-week-long trial included extensive evidence and testimony about the complex combination of federal, state, and local sources through which Montana's public elementary and secondary schools are funded. In addition to the General Fund, each school district uses up to nine other types of budgeted funds. These include transportation funds, teacher retirement funds, debt service funds, and building reserve funds. Some of these depend upon voted levies and all are primarily funded on a district or county level. School districts also have nonbudgeted funds including food service, traffic education, rental funds, sick leave reserves, block grants, building funds, endowment funds, and interlocal agreement funds. Expenditures from these nonbudgeted funds may only be made from cash on hand.

The General Fund, which provides 70% of school funding in Montana, includes several components. In 1949, the Montana Legislature enacted the Montana School Foundation Program. Under that program, every two years the legislature sets "Maximum General Fund Budget Without a Vote" (MGFBWV) schedules for elementary and secondary school districts in the state. Eighty per cent of the MGFBWV is funded by county and state equalization revenues. These equalization revenues are derived from levies of 45 mills on all taxable property in each county and state aid from such sources as earmarked

3

revenues, surplus county Foundation Program revenue, and direct legislative appropriations.

The remaining 20% of the funding of MGFBWV is through permissive mill levies of up to 6 mills for elementary districts and 4 mills for high school districts. These levies are made without a vote. If the school district is unable to obtain the MGFBWV level through permissive levies and other specified nonlevy revenue, state permissive equalization revenues are used to make up the difference.

The evidence shows that, in 1985-86, most school districts adopted budgets in excess of the MGFBWV. They utilized a third stage of funding under which monies were obtained primarily from property tax levies voted by each school district. Other revenues which were used in this third level of funding included vehicle taxes, interest income, tuition income, and federal "874" funds. By 1985-86, 35% of all General Fund budgets were obtained from this level of funding. In contrast, in 1950, the Foundation Program furnished 81.2% of all general fund revenues in Montana, leaving less than 20% of revenues to be obtained by local levies and other sources.

Plaintiffs presented voluminous evidence to support their theory that the system of funding public education in Montana is unconstitutional. The evidence established great differences in the wealth of the various school districts and, more significantly, established disparities of spending per pupil as high as 8 to 1 in comparisons between similarly-sized school districts. We affirm the following unchallenged findings of the District Court:

> 214. Several Plaintiff witnesses had experience either as teachers or administrators in other Montana districts, including some relatively wealthier districts. Mr. Walt Piipo, for example,

4

currently Superintendent at Drummond, was previously Superintendent for Geraldine schools. The two school districts are very close in size, at both the elementary and high school levels. Geraldine's taxable valuation, however, is more than twice that of Drummond's. The tax efforts for the elementary schools are comparable, while Geraldine levies more General Fund mills than does Drummond at the high school level. Consequently, Geraldine spends approximately $1,000 more per ANB than Drummond at the elementary level, and over $2,000 more per ANB at the high school level. Approximately 40% of Geraldine's General Fund revenues derive from the voted levy, while at Drummond, the voted levy supplies approximately 15% of General Fund revenue. This illustrates the fact that wealthier districts are able to rely to a greater extent on the voted levy to generate revenues for the General Fund.

215. Mr. Piipo testified unequivocally that Geraldine schools have advantages, and offer opportunites, which Drummond schools cannot afford. Geraldine has much greater budget flexibility to address educational needs and goals than does Drummond. Mr. Piipo testified that there is no question that the educational opportunities afforded students in Drummond could be improved if the district had the same amount of money as Geraldine.

216. The fact that spending disparities result in unequal educational opportunities was established more systematically by Plaintiffs' experts Dr. Ron Mattson, Mary Pace, and Dr. John Picton. Each of these individuals has many years' experience in Montana public education. They comprised a "Study Team" which was commissioned by the Plaintiffs to do a comparative study of several pairs of school districts in the State. They compared three pairs of elementary districts, and three pairs of secondary districts. Schools in each pair were of similar size, with one spending considerably more per pupil than the other. In addition to analyzing the budget data for each of these districts, members of the Study Team visited all 12 districts to observe the schools first hand, and to conduct interviews with administrators and teachers.

217. The Study Team identified clear differences between the schools in each of the pairs. They found that the better funded schools tended to offer more enriched and expanded curricula than

5

those offered in the schools with less money. The richer schools were also better equipped in the areas of textbooks, instructional equipment, audio-visual instructional materials, and consumable supplies. With respect to buildings and facilities, the districts with more money were better able to maintain their facilities than were the poorer districts. The Study Team concluded:

>*Availability of funds clearly affect the extent and quality of the educational opportunities.
>*There is a positive correlation between the level of school funding and the level of educational opportunity.
>*The better funded districts have a greater flexibility in the reallocation of resources to programs where there is a need.
>*The differences in spending between the better funded and underfunded districts are clearly invested in educationally related programs.
>*All 12 school districts in this study exhibited a responsible and judicious use of their financial resources.

R. Mattson, M. Pace, and J. Picton, Does Money Make a Difference in the Quality of Education in the Montana Schools?

218. Intervenor-Plaintiff MEA commissioned a study similar to that conducted by Plaintiffs' Study Team. Dr. Gary Gray, an assistant professor in Eastern Montana College's School of Education, studied educational opportunities in a number of high and low spending school districts in Montana. His methodology differed from that of the Plaintiffs' Study Team, but he arrived at essentially the same conclusions. Dr. Gray used an extensive checklist of indicators to compare educational opportunities among school districts within two expenditure classifications, a low expenditure category, and high expenditure category.

219. Dr. Gray concluded that there are substantial differences in educational opportunities among Montana school districts, which are manifested significantly between the high versus low expenditure categories which he studied. More specifically, he found that wealthier districts offered more science classes, in labs which were

6

typically larger, better stocked with more equipment and consumable supplies, with more storage, and generally more functional than those in poorer districts. Consequently, students in wealthier districts had more "hands on" learning experiences than students in poorer districts. Dr. Gray found the same things to be true in the home economics and industrial arts programs. Similarly, schools with more money tended to offer a wider and more enriched range of courses in the language arts, including foreign languages.

220. In the specialty areas of physical education, music, and art, the wealthier schools offered more opportunities. Gifted and Talented Programs were much stronger in the high expenditure districts. Consistant with the situation in many Plaintiff districts, Dr. Gray found that many of the low expenditure districts could not even afford to offer a Gifted and Talented Program.

221. With respect to computers, he found significant differences, with the high expenditure districts having more and better computers and computer labs. He also found significant differences between the two expenditure categories for library and media center services, with the high expenditure districts having larger and newer book collections, larger periodical collections, larger reference collections, larger audio-visual collections, and better special collections.

222. With respect to facilities, high expenditure districts reported that they have not had to defer necessary maintenance or work projects due to a lack of funds, as have low expenditure districts.

223. Wealthier districts also offer a wider range of extracurricular activities to students than low expenditure districts.

224. In sum, the comparative evidence establishes that spending differences among similarly sized school districts in the State result in unequal educational opportunities for students. Furthermore, the comparative evidence verifies the fact that the deficiencies and problems identified by Plaintiff witnesses are part of a consistent pattern in lower-spending districts, and that such deficiences and problems are not consistantly found in relatively higher spending districts.

[footnotes and citations to exhibits omitted]

The problems were compounded by the adoption of Initiative 105 in the November 1986 general election. In 1987 the Legislature adopted Senate Bill 71. See, §§ 15-10-401, -402, -411, and -412, MCA. The District Court correctly found that the net effect was to freeze property tax levies at 1986 levels, which resulted in the locking in of any disparities and inequities.

Federal "874" funding is not presently included in the State's computations for the funding of schools. However, plaintiffs' experts did include "874" funds in some of their studies comparing the wealth of various school districts. Intervenor-defendant Hays-Lodge Pole Elementary School Dist., et al., (Hays-Lodge Pole) is an association of Montana public schools which receive "874" funds by reason of the attendance of Indian students on and around the 7 federal treaty reservations in Montana. Hays-Lodge Pole argued that "874" funds should remain outside of the State's budgetary process.

The District Court concluded that education is a fundamental right under Montana's Constitution. It concluded that, under the 1985-86 system of funding public elementary and secondary schools, disparities in per pupil spending among schools as a result of disparities in local property wealth do not even pass the rational basis test of equal protection analysis. It concluded that the concept of local control is not related to the spending disparities now present. It further concluded that the State's budgetary difficulties do not constitute a legal defense to these inequalities.

The court also concluded that the Montana School Accreditation standards do not define the constitutional right to education. It concluded that the treatment of federal "874" funding for schools with Indian enrollment exacerbates the inequalities present in the school finance system. The court

ordered that the present system of school funding may remain in effect until October 1, 1989, and retained jurisdiction, but left to the Legislature the task of fashioning a constitutional funding system.

The State of Montana and defendants Holje, Ward, and Frederich appeal the District Court's determination that the present system of school funding is unconstitutional. The Montana Board of Public Education asks this Court to clarify the comments in the District Court's findings concerning the role of accreditation standards which the Board establishes. Hays-Lodge Pole raises five allegations of error in the District Court's ruling that federal "874" funding should be considered for purposes of equalization. Plaintiffs cross-appeal on the denial of their request for attorney fees.

I

Does Montana's system of funding the public schools violate the education article, Art. X, of the Montana Constitution?

Art. X, Sec. 1, Mont.Const., provides:

> (1) It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state.
> (2) The state recognizes the distinct and unique cultural heritage of the American Indians and is committed in its educational goals to the preservation of their cultural integrity.
> (3) The legislature shall provide a basic system of free quality public elementary and secondary schools. The legislature may provide such other educational institutions, public libraries, and educational programs as it deems desirable. It shall fund and distribute in an equitable manner to the school districts the state's share of the cost of the basic elementary and secondary school system.

9

By referring to the discussions in the transcript of the 1972 Montana Constitutional Convention, the State contends the provision in subsection (1) that "[e]quality of educational opportunity is guaranteed to each person," is an aspirational goal only. We disagree with that contention. In interpreting the Constitution, as in statutory construction, this Court must first look to the plain meaning of the words used. State ex rel. Cashmore v. Anderson (1972), 160 Mont. 175, 184, 500 P.2d 921, 926. In the first sentence of Art. X, Sec. 1(1), the framers of the Constitution clearly stated the "goal" of the people to establish a system of education which will develop the full educational potential of each person. In the next sentence, the framers did not use the term "goal." Instead they stated that equality of educational opportunity "is guaranteed" to each person of the state. As we review our Constitution, we do not find any other instance in which the Constitution "guarantees" a particular right. We conclude that the plain meaning of the second sentence of subsection (1) is that each person is guaranteed equality of educational opportunity. The plain meaning of that sentence is clear and unambiguous.

The State argues that the last sentence of subsection (3) limits the Legislature's duty in connection with the guarantee of equal educational opportunity. It points out that Foundation Program funds are conceded by all parties to have been distributed in an equitable manner, and then suggests that because the State has distributed such funds in an equitable manner as required under the last sentence of subsection (3), the Legislature has met its constitutional obligations as required under Art. X, Sec. 1.

Art. X, Sec. 1(3), Mont.Const., requires that the Legislature shall provide a basic system of free quality education, that it may provide various types of educational

10

institutions and programs, and that the state's share of the cost of the basic system shall be distributed in an equitable manner. There is nothing in the plain wording of subsection (3) to suggest that the clear statement of the obligations on the part of the Legislature in some manner was intended to be a limitation on the guarantee of equal educational opportunity contained in subsection (1). The guarantee provision of subsection (1) is not limited to any one branch of government. Clearly the guarantee of equal educational opportunity is binding upon all three branches of government, the legislative as well as the executive and judicial branches. We specifically conclude that the guarantee of equality of educational opportunity applies to each person of the State of Montana, and is binding upon all branches of government whether at the state, local, or school district level. We hold that the last sentence of subsection (3) is not a limiting provision on the guarantee of equal educational opportunity contained in subsection (1).

The evidence presented at the trial of this case clearly and unequivocally established large differences, unrelated to "educationally relevant factors," in per pupil spending among the various school districts of Montana. The evidence also demonstrated that the wealthier school districts are not funding frills or unnecessary educational expenses. Plaintiffs' expert witnesses testified that discrepancies in spending as large as the ones present in Montana translate, in their opinions, into unequal educational opportunities. There was also unrebutted testimony that Foundation Program funding falls short of even meeting the costs of complying with Montana's minimum accreditation standards.

The State attempted to present an argument at trial that equality of educational opportunity is more appropriately measured by output, that is, by analysis of the success of

11

students from the different school districts, rather than by input of dollars. The District Court concluded that the State had failed to submit convincing evidence on the output theory of measurement. We agree with that conclusion on the basis of this record. The District Court found similarly unpersuasive the argument that statewide fiscal difficulties in the last few years somehow excuse the disparities in the spending per pupil in the various school districts. We agree with the District Court that such fiscal difficulties in no way justify perpetuating inequities.

The State also argued that the Constitutional directive of local control of school districts, Art. X, Sec. 8, Mont. Const., requires that spending disparities among the districts be allowed to exist. That section provides:

> School district trustees. The supervision and control of schools in each school district shall be vested in a board of trustees to be elected as provided by law.

While Section 8 does establish that the supervision and control of schools shall be vested in the board of trustess, there is no specific reference to the concept of spending disparities. Further, as made especially apparent after the passage of Initiative 105, the spending disparities among Montana's school districts cannot be described as the result of local control. In fact, as the District Court correctly found, the present system of funding may be said to deny to poorer school districts a significant level of local control, because they have fewer options due to fewer resources. We conclude that Art. X, Sec. 8, Mont.Const., does not allow the type of spending disparities outlined in the above quoted findings of fact.

In 1972, when our Constitutional Convention met, approximately 65% of General Fund revenues were funded through the

Foundation Program. Con.Con. Tr. 2157. The transcript of the debate on Art. X, Sec. 1(3), Mont.Const., clearly expresses the delegates' concern with that level of funding. See, for example, Con.Con. Tr. 1981-86, 2152-59.

We conclude that as a result of the failure to adequately fund the Foundation Program, forcing an excessive reliance on permissive and voted levies, the State has failed to provide a system of quality public education granting to each student the equality of educational opportunity guaranteed under Art. X, Sec. 1, Mont.Const. We specifically affirm that portion of the District Court's Conclusion of Law 17 which holds that the spending disparities among the State's school districts translate into a denial of equality of educational opportunity. We hold that the 1985-86 system of funding public elementary and secondary schools in Montana is in violation of Article X, Section 1 of the Montana Constitution.

In analyzing school funding under an equal protection analysis pursuant to the provisions of Art. II, Sec. 4, Mont.Const., the District Court concluded that education is a fundamental right and also made numerous and extensive findings of fact and adopted a number of conclusions of law. Because we have concluded that the school funding system is unconstitutional under Art. X, Sec. 1, Mont.Const., we do not find it necessary to consider the equal protection issue. We therefore make no decision with regard to the findings of fact and conclusions of law relating to the equal protection of the laws analysis of the District Court, and in particular do not rule upon the determination by the District Court that education is a fundamental right.

Several of the parties suggested that in the event we concluded the school funding was unconstitutional, we should spell out the percentages which are required on the part of

the State under the Foundation Program and for the districts under the voted levy system. We are not able to reach that type of a conclusion. As previously indicated, the 1985-86 school funding involved more than 20 different funds. The control of such funds is primarily in the Legislature. Our opinion is not directed at only one element of the system of funding public schools in Montana, as we recognize that the Legislature has the power to increase or reduce various parts of these elements, and in addition to add other elements for such funding.

While this opinion discusses spending disparities so far as pupils are concerned, we do not suggest that financial considerations of that type are the sole elements of a quality education or of equal educational opportunity. There are a number of additional factors which are a significant part of the education of each person in Montana, including but not limited to such elements as individual teachers, classroom size, support of the parents of students, and the desire and motivation on the part of the student which moves him or her to seek earnestly after an education. By not discussing these elements, we do not in any way suggest they are irrelevant, for the financing of education is only one aspect of equal educational opportunity. Our opinion is intentionally limited to the elements discussed in the opinion.

II

Should this Court clarify the District Court's findings regarding the accreditation standards promulgated by the Montana Board of Public Education?

Under Art. X, Sec. 9(3), Mont.Const., the Montana Board of Public Education (Board) has general supervisory power over the public school system. The Board has adopted state-wide accreditation standards for elementary and secondary schools. Those standards require teachers to be certified by

14

the State, limit teachers' class loads, outline a minimum instructional program (for example, courses required for high school graduation), and establish minimum size, maintenance, and safety standards for school facilities. The Board argues that these standards establish the instructional component of a basic system of free quality public elementary and secondary schools. It objects to the District Court's findings no. 262 and 270, which read as follows:

> 262. The testimony of superintendents, teachers, and trustees clearly establish that from a professional educators' perspective, the minimum Accreditation Standards in no way define a quality education.
>
> . . .
>
> 270. In sum, the Montana School Accreditation Standards are minimum standards only, and do not provide the basis for defining quality education.

The Board also objects to the last sentence of the court's conclusion no. 18:

> 18. . . . Thus, the Montana School Accreditation Standards do not define either the constitutional rights of students or the constitutional responsibilities of the State of Montana for funding its public elementary and secondary schools.

The Board moved the District Court to amend the above findings, but the motion was deemed denied after 45 days had passed, under Rule 59(d), M.R.Civ.P. None of the parties disagree with finding no. 261 of the District Court that the accreditation standards establish a minimum upon which quality education can be built.

After reviewing the Board's argument and the transcript, we conclude that the findings and conclusion in question should be amended as requested. We therefore hold that

15

findings of fact 262 and 270 and conclusion of law 18 shall
be amended to read as follows:

> [Finding of Fact 262.] The testimony of superin-
> tendents, teachers, and trustees clearly estab-
> lishes that from the professional educators'
> perspective, the minimum accreditation standards do
> not fully define a quality education.

> [Finding of Fact 270.] In sum, the Montana School
> Accreditation Standards are minimum standards upon
> which quality education must be built.

> [Conclusion of Law 18.] Thus, the Montana School
> Accreditation Standards do not fully define either
> the constitutional rights of students or the con-
> stitutional responsibilities of the State of Mon-
> tana for funding its public elementary and
> secondary schools.

### III

Did the District Court err in its findings and conclu-
sions relating to consideration in the equalization process
of federal "874" funding?

Public Law 81-874 ("874") was enacted by the United
States Congress in 1950. It provides federal payments to
school districts which serve children who reside on or whose
parents are employed on federal property, including Indian
lands, or who have a parent on active duty in the military.

Hays-Lodge Pole asserts that, contrary to the District
Court's finding, Public Law 81-874 has as one of its purposes
assisting with the special problems in Indian education and
is not only a federal effort to replace lost tax revenue
resulting from the federal presence. It argues also that the
court's finding that, in some districts, "874" funding has
been used as tax relief is irrelevant and shows only the
State's neglect of the special needs of Indian children. It
contends that "874" funding is closely tied to the need on

16

and near Indian reservations for additional school funding because of the extraordinary educational difficulties present - language barriers, poverty, unemployment, and cultural differences. It maintains that any inequity present in "874" districts will vanish when the Montana funding system is equalized without consideration of "874" funding and that the history of neglect of Indian education justifies judicial protection of the benefits provided by "874" funding. Hays-Lodge Pole argues that the District Court erred in ruling that the Legislature may consider "874" funding in equalization.

This issue is resolved by the federal statutory requirement that the United States Secretary of Education must approve of Montana's equalization plan before "874" funding may be taken into account. 20 U.S.C.A. § 240(d)(Supp. 1988). The District Court recognized this requirement in its finding no. 235, and found that Montana's system had not secured that federal approval. We specifically affirm the District Court's Conclusions No. 20:

> 20. A state may factor P. L. 81-874 revenue into its school finance equalization system only if the system meets the federal definition of an equalized program, subject to the determination of the Secretary of Education. [See Gwinn Area Community Schools v. State of Michigan, 741 F.2d 840 (6th Cir. 1984)] Montana presently does not and may not factor P. L. 81-874 revenue into the Foundation Program equalization formula, because Montana's system does not meet the federal definition of an equalized program.

Art. X, Sec. 1(2), Mont.Const., states as follows with regard to our American Indians:

> The state recognizes the distinct and unique cultural heritage of the American Indians and is

17

> committed in its educational goals to the preservation of their cultural integrity.

That provision establishes a special burden in Montana for the education of American Indian children which must be addressed as a part of the school funding issues. We do invite the attention of the Legislature and the executive branch to Montana's failure to meet the federal equalization requirements. As a part of the changes to be made in Montana's school funding system, it may be appropriate to meet the federal equalization requirements in order that "874" funding may be factored into the State's equalization formula.

## IV

Did the District Court err in denying plaintiffs' attorney fees?

Plaintiffs argue that they are entitled to recover their reasonable attorney fees under the "common fund" doctrine. This Court has described that doctrine as one which:

> . . . provides that when a party through active litigation creates, reserves or increases a fund, others sharing in the fund must bear a portion of the litigation costs including reasonable attorney fees. The doctrine is employed to spread the cost of litigation among all beneficiaries so that the active beneficiary is not forced to bear the burden alone and the "stranger" (i.e., passive) beneficiaries do not receive their benefits at no cost to themselves.

Means v. Montana Power Co. (Mont. 1981), 625 P.2d 32, 37, 38 St.Rep. 351, 355-56. See also Serrano v. Priest (Cal. 1977), 569 P.2d 1303, 1310-11.

The District Court concluded that the common fund doctrine did not apply in this case because no common fund was created from which attorney fees and expert witness fees could be paid. In a similar manner, under the "substantial

18

benefit" concept which has grown out of the common fund doctrine, the District Court concluded that no substantial benefit had resulted from its opinion and that no such benefit would accrue unless the Legislature acts. We conclude that the District Court properly denied attorney fees. We affirm the District Court's denial of plaintiffs' request for attorney fees.

V

We approve the District Court's rationale that "in order to provide the Legislature with the opportunity to search for and present an equitable system of school financing," the holdings in this case should not become immediately effective. We modify the reservation of jurisdiction by the District Court to provide that this Court specifically retains jurisdiction until July 1, 1989, and on that date the holdings of this opinion shall become fully in effect for all school terms commencing after that date.

_____
Justice

We Concur:

_____
J. A. Turnage
Chief Justice

_____
John Conway Harrison

_____
John C. Sheehy

_____
L. C. Gulbrandson

_____
William E. Hunt

_____
R. C. McDonough
Justices

Justice John C. Sheehy, concurring:

I concur emphatically with the foregoing opinion but wish to comment respecting the entitlement of plaintiffs to attorney fees.

We cite Serrano v. Priest (Cal. 1977), 569 P.2d 1303, 1310-1311, to the effect that the common fund theory and the substantial benefit theory do not at this time present a basis for attorney fees. Not to be forgotten, however, is that in <u>Serrano</u>, the court awarded the plaintiffs attorney fees on the "private attorney general" theory. If, as we all hope, because of the efforts of the plaintiffs an equitable funding of education is eventually established, all of the requisites for an award of attorney fees on the private attorney general theory would be present in my view.

_John C. Sheehy_
Justice