OPINION OF THE COURT
Robert Roberto, Jr., J.
Almost nine years after the Court of Appeals rendered its landmark decision in Board of Educ. v Nyquist (57 NY2d 27), the courts are once again asked to determine the constitutionality of our State school funding system. This case presents one of the most challenging issues, perhaps more important *715 and more fundamental to the future of our State than any other. Education is paramount in preparing our children to function in society as citizens and workers.
Plaintiffs in this action are R.E.F.I.T., a not-for-profit membership organization, suing both for itself and on behalf of 40 membership school districts; boards of education of 21 individual school districts; individual taxpayers; and parents and students residing in several participating school districts. The above-entitled complaint seeks to declare New York State’s system of funding public education unconstitutional and to obtain appropriate injunctive relief. The gravamen of their complaint rests on three causes of action. Plaintiffs assert: (1) the State’s financial scheme for education fails to satisfy the education article of the New York State Constitution (art XI, § 1); (2) the State’s financial scheme for education based on property tax valuation violates the Equal Protection Clause of the New York State Constitution (art I, § 11); and (3) the State’s financial scheme violates the Equal Protection Clause of the Federal Constitution (14th Amend, § 1).
Plaintiffs complain of the inadequacy and unfairness of the agglomeration of 51 different legislatively devised formulas by which $8 billion in State aid is distributed among the State’s 700 school districts. Consequently, they maintain huge disparities have resulted between low-wealth and high-wealth districts, to the detriment of districts, students and taxpayers alike.
On the State’s motion to dismiss pursuant to CPLR 3211 (a) (7), the court must accept the plaintiffs’ allegations as true and must "resolve all inferences which reasonably flow therefrom in favor of the pleader” (Sanders v Winship, 57 NY2d 391, 394).
The issues raised in this action were first raised in Board of Educ. v Nyquist (94 Misc 2d 466, mod 83 AD2d 217, mod 57 NY2d 27, appeal dismissed 459 US 1138) (Levittown). Therein, a declaratory judgment action was instituted in June 1974, by the boards of education of 27 school districts and 12 students of public schools located in some of those districts. The intervenor-plaintiffs were the boards of education, officials, resident taxpayers and students in the Cities of New York, Buffalo, Rochester and Syracuse, together with a federation of parent and parent-teacher associations. The original plaintiffs were considered to be "property-poor” school districts. They maintained that the system for financing public schools, as *716 principally set forth in sections 2022 and 3602 of the Education Law, by which funds raised by locally imposed taxes are augmented by allocations of State moneys in accordance with a variety of formulas and grants resulting in grossly disparate financial support, violated the Equal Protection Clauses of the State and Federal Constitutions and the education article of the State Constitution. The intervenors, although not claiming to be disadvantaged in their ability to raise gross revenue from local sources, also asserted violations of the same constitutional provisions as a result of circumstances, peculiar to cities, which result in special financial burdens.
After a 122-day nonjury trial producing 23,000 pages of transcript and 400 exhibits, Justice L. Kingsley Smith issued a judgment declaring that the State’s public school finance system violated both the Equal Protection Clause (art I, § 11) and the education article (art XI, § 1) of the State Constitution. And as to the cities represented by the intervenors, the Equal Protection Clause (14th Amend, § 1) of the Federal Constitution as well. The Appellate Division modified this decision by rejecting the conclusion that the intervenors had also established a violation of the Federal Constitution.
The Court of Appeals modified, and in an opinion by Judge Jones, held that the statutory provisions for allocation of State aid to local school districts for the maintenance and support of public elementary and secondary education were not violative of the Equal Protection Clause of either the Federal or State Constitution, nor were they unconstitutional under the education article of the State Constitution.[1]
In Levittown (supra), the majority of the court determined the intent of the education article, adopted in 1894, was to assure minimal acceptable facilities and services in contrast to the unsystemized delivery of instruction then in existence within the State.
No claim was advanced by plaintiffs that any student had been denied an education, nor was any claim advanced that education had fallen below the State minimum standard of quality and quantity fixed by the Board of Regents. The basis of plaintiffs’ action rested on the disparity in expenditure per pupil between the low-wealth districts and the high-wealth districts.
*717 The Court of Appeals, in 1982, recognized the very real disparities of financial support; however, it concluded disparities alone do not establish a violation of Federal or State Constitutions. While the existence of a significant correlation between amounts of money expended and the quality and quantity of education opportunity offered was conceded, the court found no requirement that education made available be equal or substantially equivalent in every district. The court stated that there was no: "provision either that districts choosing to provide opportunities beyond those that other districts might elect or be able to offer be foreclosed from doing so, or that local control of education, to the extent that a more extensive program were locally desired and provided, be abolished.” (57 NY2d, at 47.)
The Court of Appeals disposed of the equal protection claims holding that New York’s provisions for public financing of education did not violate the Equal Protection Clauses contained in the United States Constitution or the New York State Constitution. This decision was made notwithstanding disparities in per-pupil expenditures among the State’s school districts, resulting largely from the difference in the revenue available for educational purposes as a consequence of unequal real property tax bases or unequal demands on local revenue. The Court of Appeals applied the rational basis standard of review and found no impermissible discrimination against pupils in the less property-wealthy districts. The school system of funding was found to have a rational relationship to a legitimate State purpose: the preservation and promotion of local control of education districts were attributed to demographic, economic and political factors intrinsic to these districts themselves and not to legislative action or inaction. No authority was cited to show discrimination between local government units required a stricter standard of scrutiny, and so the constitutionality was upheld.
In rejecting the plaintiffs’ education article argument, the court found great comfort in emphasizing New York State’s relatively high pupil education expenditures in comparison to other States. The majority also expressed a reluctance to override legislative decisions by mandating an even higher priority for education, "in the absence, possibly of gross and glaring inadequacy — something not shown to exist in consequence of the present school financing system.” (57 NY2d, supra, at 48-49.)
*718 Clearly, the Court of Appeals intentionally left the door open for future litigation. However, it is unclear whether Judge Jones, in writing for the majority, intended "gross and glaring inadequacy” to refer to the funding of education, as plaintiffs maintain, or the quality of education provided.
The plaintiffs in this action do not request that Levittown (supra) be overruled, nor do they allege education has become inadequate or below minimum standard. Plaintiffs’ theory on the case rests primarily on their belief that they come within the narrow opening articulated in Levittown. More specifically, it has been asserted that the "gross and glaring inadequacy” the majority found absent a decade ago, now exists in that the gap between rich and poor districts has widened dramatically since Levittown.
The disparity between the richest and poorest districts in the entire State at the time Levittown (supra) was decided was only 46 to 1 and in Suffolk only 17 to 1. Now, the maximum disparity in Suffolk is nearly 330 to 1, disparities of 100 to 1 are not uncommon, and 19 Suffolk districts are 16 times richer than William Floyd and Wyandanch (a ratio observed in Levittown only in the most extreme single case). It seems what was the exception in Levittown has now become the rule.
Plaintiffs have also demonstrated a growing disparity in per-pupil expenditure. William Floyd, the county’s poorest district, also had the lowest per-pupil expenditure at $7,107. No plaintiff district ranked higher than Islip at $10,573. By contrast, their more affluent neighbors spent as much as $43,000 per pupil, with 10 over $20,000 and 39 over $10,000.
At the time Levittown (supra) was decided, the most extreme per-pupil expenditure disparities were only 2 to 1 in Nassau ($4,040 vs $2,096) and 4 to 1 in Suffolk. Now, 3 poor Suffolk districts are outspent 6 to 1, and 10 districts outspend these 3 districts by more than 3 to 1.
In their answers, the nonmoving defendants, Cuomo, Wetzler, Ohrenstein, Miller and Tallón, admit that: "there are approximately 51 different formulas for school aid distribution, that school aid formulas do not account for all disparities in local and regional needs, costs and resources, that State aid formulas produce less than half the money spent by the schools and that districts rely largely on their own vastly disparate resources, and that districts with relatively low property and income wealth per pupil * * * may be deprived of the wherewithal to compete with wealthier neighbors. ”
*719 The statistical disparities do, in fact, have real world consequences and are not attributable to low tax effort by the poorer districts. William Floyd, Suffolk’s poorest and lowest-spending district (and one of its largest), taxes itself at the highest wealth-adjusted rate in the entire State, at $101.50 per $1,000 valuation.[2] Four of the plaintiff districts: William Floyd, Central Islip, Brentwood and Middle Country, are among the six highest tax rate districts in the State.
Suffolk’s William Floyd crowds 40% of its 9,500 students into rapidly deteriorating portable classrooms, is unable to offer pre- or full-day kindergarten, has the largest class sizes on the Island and has nearly 12% of its students in special education placements.
Nassau’s Roosevelt maintains pupil-teacher ratios double those of other districts, 33 to 1 in grades 3-12 and 28 to 1 in grades K-2. While Federal funds finance remediation until students achieve reading competency beyond the national 23rd percentile, it becomes unavailable after that point, and the district is unable to continue remediation with its own funds. Subsequently, students fall back below the 23rd percentile and never achieve their proper grade level.
Additionally, plaintiffs’ high-risk student populations have increased disproportionately, along with the associated burdens.
At the time of Levittown (supra), Roosevelt was nearly unique among the school districts in having a predominantly minority student population. That is no longer the case. Today Brentwood has over 10,500 students, 38% Hispanic and 16% Afro-American; approximately 1,000 students require special programming for limited English proficiency.
Elmont’s minority population has grown from 22% in 1981-1982 to 52% today, while its handicapped and its disabled have risen from 6 to 11% and its learning disabled from 1 to 6%. As many of the plaintiffs, Elmont’s high-risk population has increased while its own wealth has decreased. Furthermore, the State increasingly imposes costly mandates, without providing funds for their implementation. In the Levittown litigation, mandates were not an issue; however, in recent years costly State-imposed mandates have proliferated, resulting in a disproportionately harsh impact on the property-poor *720 districts. These districts have been forced to finance such costly mandates as asbestos removal programs by cutting funds from operating budgets — reducing teaching and other staff, eliminating educational programming, or making other sacrifices detrimental to their educational mission.
The plaintiffs herein have vividly demonstrated the disparities in expenditures per pupil between property-wealthy and property-poor districts. The State maintains that this showing is insufficient under the Levittown holding, absent a showing of "gross and glaring inadequacy” in the quality of education provided.
Moreover, the State maintains the students in the poorer districts are receiving a minimum standard of education (or at least that no contrary allegation has been advanced). Yet, no "minimum standard” has been submitted, if one indeed exists. We cannot possibly infer a true standard from the broad language of the education article, adopted in 1894.
In 1925 the Cole-Rice Law (L 1925, ch 675) was implemented to equalize both educational opportunity and tax burden throughout the State, in light of the 1894 Constitution. This "foundation” system was thereby adopted and remains largely in place today. Therein each district is guaranteed a minimum amount of State aid per pupil based on average daily attendance, while full valuation of real property, on an equalized basis, was made the determinant or measure of each district’s ability to tax itself.
In 1962 the Legislature adopted the Diefendorf formula (see, 1962 NY Legis Doc No. 10) in response to inequities — State aid formula was then made self-adjusting in order to keep pace with increasing property valuations.
However, in 1974 the Fleischman Commission concluded the school finance system had broken down and required "basic reform.” The Legislature in response thereto, adopted an "interim measure” intended to remain in place for only one or two years — until a new structure could be put in place. This interim measure provided that the State would assist each district to raise a minimum amount of operating aid per pupil by imposition of a hypothetical minimum tax on its own local real property wealth.
To ameliorate the anticipated impact of this interim formula on wealthy districts and those with shrinking student populations, the Legislature enacted two forms of temporary "save harmless” provisions.
*721 Total save harmless entitled a district to at least the same amount of operating or other program aid received in the prior year (adjusted for inflation). And per-pupil save harmless entitled a district to at least the same amount of aid per pupil (adjusted for inflation) received in the previous year, even if State aid formula would dictate a lesser amount.
In actual operation, the availability of save harmless ensures that a district never receives less than the maximum (adjusted upward for inflation) it ever received no matter how the formula or facts change.
These temporary measures, in effect for 17 years, or through the 1990-1991 school year, have canceled out the theoretically equalizing effect of certain aspects of 1974 legislation and of subsequent statistical changes.
There are districts whose State aid is determined not by the present formula, but through save harmless, the formula of 30 years ago.
As another layer of protection against the impact of the theoretically equalizing State aid formula, which on its face was calculated to eliminate all State operating aid to "wealthy” districts, each district was guaranteed a "flat grant” of $360 per pupil, rich or poor. Additional categories of State aid were also continued or created and were and are calculated without regard to a district’s wealth or lack thereof. These include building, transportation, BOCES and various categorical program aid.
In Levittown (supra), the defendants argued that the litigation had delayed legislative reform. Accepting this, the Court of Appeals deferred to the Legislature, absent a showing of "gross and glaring inadequacy.” Shortly thereafter, the carefully researched recommendations of the Rubin Commission were discarded, the Salerno Commission was appointed and its recommendations were ignored. Similarly, the annual submissions by defendants Sobol and Cuomo to the Legislature regarding the urgent need for reform fall on deaf ears.
Indeed, the only recent legislative action has taken the form of budget cuts. Plaintiffs have shown the current State budget crisis underscores and exacerbates the problem. The recent budget cuts had a skewed impact due to apportioning by legislators’ aid formulas. Although save harmless provisions have now been removed, the 1991-1992 budget cuts were determined by said provisions. The new State budget reduces State school aid by $460 million from last year’s level, with *722 more than half of that cut targeted for Long Island. Wealthy districts lost a greater percentage of their State aid than poorer districts. These percentages are deceiving because they do not show district losses in terms of over-all budgets; a figure which is generally considered a more accurate reflection of financial impact. Wealthy districts have maintained their local services to a large extent, even after the current budget crisis, enabling them to offer levels of service well beyond those available in their neighboring poorer communities.
Although no district likes to lose financial support, the more affluent districts are easily able to absorb the budget cut with their richer tax base. On the other hand, for poor districts it is impossible to replace the millions lost from the State aid on which they rely. Thus, even smaller deductions had a far more devastating impact, as these districts are forced to cut from already spartan programs, have no accumulated surpluses and little borrowing power. These factors lead to the ever-growing financial disparities that students across Nassau and Suffolk are faced with.
Ironically, everyone from the Governor to legislators to various committees proclaim it is a travesty to allow property wealth to determine the quality of educating children, yet the New York State school finance scheme remains unimproved. Pursuant to the State Constitution, education is the responsibility of the Legislature and the obligation of the State. While courts will not intervene to remedy every legislative inaction, they have a duty to evaluate the fulfillment of the constitutionally imposed obligation of the Legislature.
In Baker v Carr (369 US 186 [1962]), the United States Supreme Court departed from a line of precedents insulating such "political questions” as legislative apportionment from judicial inquiry — and in so doing, opened the door to a revolution in constitutional adjudication. Justice Clark, in his concurring opinion, flowing from the court’s frustration in the face of pleas that it continue to defer to legislative reform when it knew there would be none, stated: "[n]ational respect for the courts is more enhanced through the forthright enforcement of those rights rather than by rendering them nugatory through the interposition of subterfuges.” (369 US, at 262.)
The movement toward judicial intervention in public school financing reform litigation appears to be gaining momentum. Property-poor districts in 24 States have challenged the consti *723 tutionality of financing systems which had produced disparate public school funding.[3] In 1971, the California Supreme Court’s decision in Serrano v Priest (5 Cal 3d 584, 487 P2d 1241 [1971]) (Serrano I) was the first high State court ruling to recognize constitutional violations resulting from local property tax-based funding of public schools. It was argued that a financing system which causes disparities in expenditures among districts ultimately results in disparities in the quality of educational opportunities provided in those districts. Applying the strict scrutiny test, the Serrano I court ruled that no compelling State interest was served by a funding system which furthered such disparities. Thus, the court concluded that the funding system violated both the Equal Protection Clause of the Federal Constitution and the equal guaranty provisions of the California State Constitution.
Arkansas, Connecticut and Wyoming followed California in striking down local property tax-based funding systems based on State equal guaranty provisions. Other States have struck down local property tax-based funding systems based on State Education Clause violations. To be sure, not all States have struck down local property tax-based funding systems.[4]
In Rose v Council for Better Educ. (790 SW2d 186 [Ky 1989]), the Kentucky Supreme Court concluded that it is the duty of the judiciary, not the Legislature, to determine what is constitutional and failure to decide this constitutional issue would be a "denigration of [its] own constitutional duty.” (Supra, at 209.)
Kentucky’s education article provides an " 'efficient system of common schools throughout the State.’ ” (Rose v Council for Better Educ., supra, at 205.) In Rose, the State’s property tax-based school funding system was declared a violation of this clause.
The Montana Constitution requires the Legislature to provide a system of "free quality public elementary and secondary schools” (Helena Elementary School Dist. No. 1 v State of Montana, 236 Mont 44, 52, 769 P2d 684, 689 [1989]). The court *724 there struck down a property tax-based school funding system on the ground that it violated the State Education Clause.
In Texas, the State Constitution provides an "efficient system of public free schools” (Edgewood Ind. School Dist. v Kirby, 777 SW2d 391, 393 [Tex 1989]). Likewise, the court there held that the State’s system of school funding through local property tax, resulting in disparities, violated the Education Clause.
The New Jersey State Constitution provides the "maintenance and support of a thorough and efficient system of free public schools” (Abbott v Burke, 119 NJ 287, 295, 575 A2d 359, 363 [1990]). Therein, a property tax-based school funding system which resulted in expenditure disparities between property-wealthy districts and property-poor districts was found unconstitutional under the State education article.
Apparently, the high State courts in New Jersey, Texas, Montana and Kentucky linked the concepts of "efficient”, "thorough”, and "uniform” to educational equality. Still, citizens may have difficulty understanding why one State’s "uniform” mandate means equal educational opportunity, while another State’s "common” mandate demands only a minimum skills education.
In Abbott (supra) the New Jersey court noted the relevancy of disparities in educational funding to educational quality, "to the extent educational quality is deemed related to dollar expenditures, it tends to prove inadequate quality of education in the poorer districts, unless we were to assume that the substantial differential in expenditures is attributable to an education in the richer districts far beyond anything that thorough and efficient demands; it indicates even more strongly the probability that the poorer districts’ students will be unable to compete in the society entered by the richer districts’ students; and by its consistency over the years, it suggests that the system as it now operates is unable to correct this.” (119 NJ, at 337, 575 A2d, at 384.)
Poorer students need a special supportive educational effort in order to give them the chance to succeed as citizens and workers. Their educational needs are often dramatically different from those of students in affluent districts. Perhaps no amount of money could erase the impact of the socioeconomic factors that define and cause these pupils’ disadvantages. It would be foolhardy to believe that money alone would solve the problems of our educational system. Until such time as we *725 address the issues of maximizing facilities, curriculum, school terms and motivation of teachers and students together with a reasonable formula for financing the public school system, can we hope for meaningful improvement in the education of our children. Maybe nothing short of public, social and economic changes affecting housing, employment, child care, tax and welfare, would make the difference for these students.
As Judge Fuchsberg said in the Levittown dissent: "Can it be gainsaid that, without education there is no exit from the ghetto, no solution to unemployment, no cutting down on crime, no dissipation of intergroup tension, no mastery of the age of the computer? Horace Mann [said] education is not only the great equalizer of men, but, by alleviating poverty and its societal costs, more than pays for itself.” (57 NY2d 27, 51, supra.)
So, too, the Supreme Court of the United States recognized the public school "as the primary vehicle for transmitting the values on which our society rests.” (Ambach v Norwick, 441 US 68, 76 [1979].)
In spite of this court’s belief in the present inequities iri funding public education, this court is cognizant not only of the holding of the Levittown case (supra), but more importantly, of the underlying philosophy utilized by the Court of Appeals in reaching its determination. As the court stated:
"[T]he issue before us on this appeal * * * is not whether education is of primary rank in our heirarchy of societal values; all recognize and support the principle that it is. It is not whether there are great and disabling and handicapping disparities in educational opportunities across our State, centered particularly in our metropolitan areas; many recognize and decry this state of affairs. The ultimate issue before us is a disciplined perception of the proper role of the courts in the resolution of our State’s educational problems, and to that end, more specifically, judicial discernment of the reach of the mandates of our State Constitution in this regard. The expostulation of the dissenter, and the urgings of those who would alleviate the existing disparities of educational opportunity, are properly to be addressed to the Legislature for its consideration and weighing in the discharge of its obligation to provide for the maintenance and support of our State’s educational system. Primary responsibility for the provision of fair and equitable educational opportunity within the financial capabilities of our State’s taxpayers unquestionably rests with that branch of our government.
*726 "As we wrote in Montgomery v Daniels (38 NY2d 41, 53, supra): 'It is not our office to rejoice or to lament. A fair regard for the basic polity of separation of powers dictates judicial respect for the proper role of the legislative branch, and pride in the uniquely and essentially neutral role of the judicial branch. That judicial role is both a privilege and a limitation.’ It would neither serve the purposes of orderly government nor honor the role of the judiciary to lay aside standards of judicial review recently held appropriate (in decisions in which the dissenter joined) because in this instance corrective measures may, in the view of many, be much needed with respect to the provision of financial support for our educational system.” (Board of Educ. v Nyquist, 57 NY2d 27, 49, n 9, supra )
This court, aware of this philosophical underpinning of the Levittown decision (supra), is compelled to grant defendants’ motion to dismiss the complaint. Notwithstanding the merits discussed in this decision, any deviation from the Levittown holding must come from either the Court of Appeals itself or by legislative action. (See, Mountain View Coach Lines v Storms, 102 AD2d 663, 664.)

. The education article of the New York State Constitution (art XI, § 1) requires: "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.”

. State Education Department’s New York State School District Wealth Adjusted Tax Rates, 1989/1990.

. Bevelock, Public School Financing Reform: Renewed Interest in the Courthouse But Will the Statehouse Follow Suit?, 65 St. John’s L Rev 467, 469 (1991).

. See, e.g., Shofstall v Hollins, 110 Ariz 88, 515 P2d 590 (1973); Lujan v Colorado State Bd. of Educ., 649 P2d 1005 (Colo 1982); McDaniel v Thomas, 248 Ga 632, 285 SE2d 156 (1981); Richland County v Campbell, 294 SC 346, 364 SE2d 470 (1988); Fair School Fin. Council v State of Oklahoma, 746 P2d 1135 (Okla 1987).