*319 JUSTICE RICE
specially concurring.
¶55 I concur with the holding of the Court on all issues and write to offer alternative reasoning for affirming the District Court on Issues 1 and 2.
¶56 The State’s argument that this is a political question reserved for the Legislature is well supported by case authority from other states. However, I agree with the Court’s resolution and would add that this question was essentially resolved sixteen years ago by Helena Elementary Sch. Dist. No. 1 v. State (1989), 236 Mont. 44, 769 P.2d 684, wherein the Court first undertook judicial review of the constitutional issues related to school funding under the 1972 Montana Constitution. School funding has been analyzed pursuant to that decision ever since. It may have been more appropriate for the State to raise the political question defense at that time, but, in any event, I believe the Court’s decision is clearly consistent with the expectations of the Constitutional Convention delegates, who rejected an amendment which would have placed school funding within the exclusive province of the Legislature, offered by Delegate McDonough:
[W]hat is distribution in an “equitable manner”; and what is “full funding” of the educational program? Now, that should be left with the Legislature and the Legislature only, and nobody else. They’re the representatives of the people up here to decide fiscal matters, not the Supreme Court of Montana and not anybody else. It’s the Legislature that has this power, and the Legislature should have it.
... There’s going to be problems from time to time, but if you leave [the words] in as they are now worded, you’re going to have more problems of constitutional-legal construction on any lawsuits relative to the application of these last two sentences [of Article X, Section 1(3)].
Mont. Const. Conv. Tr., Vol. VI at 1963. The delegates’ rejection of the proposed amendment set the Constitution on a course that would make Delegate McDonough’s observations prescient: school funding was made an issue of constitutional dimension which requires the involvement, within their respective spheres, of both the legislative and judicial branches in order to resolve “problems of constitutional-legal construction.”
¶57 Turning to the substance of school funding under Issue 2, the Court concludes that “the Legislature can best construct a ‘quality’ system of education if it first defines what is a ‘quality’ system of *320 education” based upon educationally relevant factors. See ¶ 22. This is undoubtedly logical, but I would nonetheless refrain from suggesting how to “best construct” the educational system, and upon what factors it must do so, believing it to be an inappropriate judicial comment on the Legislature’s prerogative, if I was not convinced that the “suggestion” was, in fact, constitutionally compelled. Truly, the debates of the delegates demonstrate that, in assigning to the Legislature the task of designing the system, they intended the Legislature to assess the educational needs of the state before deciding funding issues. “After the state has assessed the needs and established what a minimum program ought to be, we feel that the state ought then to provide, by whatever means it sees fit, for the funding of the program.”[1] “Once the needs for a basic quality system of elementary and secondary schools have been realistically assessed, the state has the obligation to guarantee ....”[2]
¶58 Clearly, the power to determine what constitutes a quality system was granted to the Legislature. “We are saying to the Legislature, “We have untied your hands. We want you to set up a basic elementary and secondary education. You have full power to decide what that is going to be; but when you get it done, the state’s share of it, as you determine it’-we give the Legislature full power there to determine its share, too-we haven’t tied their hands — ‘shall be funded ....’ ”[3] Based on these indications from the delegates, I concur that the Court’s directives-to define a quality system based upon relevant factors-are appropriately given.
¶59 I agree with the Court’s focus on the word “quality,” but the Constitution also uses two other important terms in regard to educational funding requirements-“basic” and “state share.” These terms are employed to shape the Legislature’s duty with regard to educational funding. “Basic” occurs twice in describing the system the Legislature must create. Extensive explanation of the meaning of “basic” was given by Delegate Habedank, who offered the motion to add the term to the Constitution in these two places. In summary, the intention was:
*321 [T]o require the Legislature to do full funding of a basic educational program and that the frills and the things beyond the basic program, as the Legislature determines it, can still remain with the people.
... [T]he public is concerned. They are very concerned. And the delegation here ... evidenced its concern about educational theorists coming in with every type of-shall we call it “screwball education proposal” and insisting that this be in here, and it was felt that “basic” would help.
Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 1962, 2154. ¶60 Next, the delegates inserted “state share” into the Constitution to further define the Legislature’s obligation. The first sentence of Article X, Section 1(3), states that the Legislature “shall provide a basic system of free quality public” schools. The third sentence of this section states that the Legislature “shall fund ... the state’s share” of the cost of this basic system. From these provisions we understand that the Legislature must “provide”- to establish or make available-a basic system of quality education, but that the Legislature must “fund” only the “state’s share” of this system. Indeed, the District Court concluded that “the State is not paying its share of the cost of the basic elementary and secondary school system.” (Emphasis added.)
¶61 These provisions of the Constitution arose out of the delegates’ concern that the Legislature had historically failed to fully fund the Foundation Program, the then-existing vehicle for state support of public education, or state share. (“It is only when our state Legislature fails to meet the obligation under the foundation program that we begin to get these real inequities built into it. For instance, the state right now is funding only about 65 percent, and the other 35 percent has to go back on local property tax levies.”[4]) Although acknowledging that other revenue sources, including local levies, were also necessary in order to fund a basic system of quality education, the intent was to require the Legislature to fund only the state’s share of that cost:
I think there’s fear here that we’re asking the state to do all of the financing for education. This is not what we’re trying to do. I think what we’re trying to do here is to do what the foundation program has not done. I don’t think we’re trying to eliminate levies at the local level. I don’t foresee this, and I would hate to see it come. I think at the local level, still there should be *322 ability-or the people should be able to have a higher quality of education [than] in some other community. And I really think the underlying fear here is that the state is going to provide the total financing, and this is not true. We’re asking for the full funding [of the foundation program]; and when we’re asking that, we’re talking, really, in the sense that we have in the past in this area.
Delegate Woodmansey, Mont. Const. Conv. Tr., Vol. VI at 1968.
I think it’s also essential that the Legislature should have the power to require school districts to tax for a portion of their educational program in order to keep control of education at a local level, in order to allow people to know what is being spent for education, and this is what my proposal also does.
Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 2153.
¶62 In my view, the District Court’s conclusion that school funding is constitutionally inadequate is supported primarily by the evidence demonstrating that the system has once again fallen into the condition criticized by the delegates, and against which they reacted- namely, that the state’s share of the cost of education has steadily eroded to the point of insufficiency. This condition was also critically noted by the Court in Helena Elementary. Helena Elementary, 236 Mont. at 55, 769 P.2d at 690. In inflation-adjusted dollars, state aid declined between 1991 and 2003 by 17 percent, and local taxes have increased by 120 percent to pay for the cost of education. The state share of the general fund declined to 60.95 percent in 2003. Thus, while the funding system created under HB 667 addressed the constitutional problem caused by disparities in funding between school districts-the primary issue in Helena Elementary-it nonetheless failed, over time, to maintain state support and satisfy the state’s duty to fund its share of education, thus running afoul of a separate constitutional mandate. The evidentiary focus on such factors as deterioration of school buildings and the departure of educators is appropriate in assessing the health of the system, but such factors are merely symptoms of the underlying disease: the state’s failure to fully fund its share of educational costs. This is a long term, systemic and fundamental flaw which I believe violates the last sentence of Article X, Section 1(3).[5]
*323 ¶63 In conclusion, the Court has noted that this decision stands on its own and does not necessarily affirm the entirety of the District Court’s order. The District Court’s yeoman efforts are to be saluted, and we simply do not have time to address each matter ruled upon in its lengthy decision. I would make one exception and offer comment thereon. In Finding of Fact No. 186, the District Court found that the constitutional mandate to the Legislature does not depend on the state’s fiscal capacity, citing Helena Elementary. However, in Helena Elementary, we found “unpersuasive the argument that statewide fiscal difficulties in the last few years somehow excuse the disparities in the spending per pupil in the various school districts.” Helena Elementary, 236 Mont. at 54, 769 P.2d at 690. In other words, limited resources did not excuse the unequal distribution of those resources. That is not the problem here. While legislators cannot avoid school funding problems because of financial concerns, it should also be stated that the school funding obligation, as with any financial obligation, even one of constitutional dimension, is necessarily circumscribed by the State’s “fiscal capacity.” Indeed, this was acknowledged by the delegates: “the committee realizes that economic resources of the state limit this [educational] goal.”[6]
¶64 The extensive quotations from the transcripts of the constitutional convention herein are made with the understanding that the statement or intention of one delegate does not necessarily equate with the intention of the delegates as a body or of the Great Work they created. However, a comparison of the words of the Constitution with a study of the entirety of the debates allows one to glean the delegates’ intentions with regard to the issue of educational funding with, in my view, a high degree of confidence. I believe the quotations herein accurately reflect those intentions.
¶65 I concur.
CHIEF JUSTICE GRAY joins in the special concurring opinion of JUSTICE RICE.

 Delegate Harbaugh, Mont. Const. Conv. Tr., Vol. VI at 1961 (emphasis added).

 Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 1962 (quoting committee comments) (emphasis added).

 Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 2153.

 Delegate Blaylock, Mont. Const. Conv. Tr., Vol. VI at 2157.

 Neither is it inappropriate for the state to draw attention to output measures such as test scores. This is evidence which supports the testimony of several school officials that they are continuing to provide a “quality” education despite funding difficulties. However, like the Court, I believe that test scores do not tell the full story. I disagree only with the Court’s statement that “it may be” that high test scores were not achieved because of the current system. See ¶ 30. That statement is speculative; but further, I believe our schools and the state are entitled to take credit for this positive *323 achievement as one produced by the current system.

 Delegate Harbaugh, Mont. Const. Conv. Tr., Vol. VI at 1949-50.