JUSTICE TRIEWEILER
delivered the Opinion of the Court.
¶1 The Appellant, Alice P. Kloss, opened financial services accounts with the Defendants, Edward D. Jones & Co. and Paul Husted, in 1992 and 1998. The agreement between Kloss and Jones contained predispute arbitration clauses. After Kloss filed a complaint in the District Court for the Eighth Judicial District in Cascade County in which she sought damages caused by Husted’s wrongful conduct, Jones filed a Motion to Compel Arbitration. The District Court granted the motion and Kloss appealed. While the appeal was pending, Jones located Kloss’ 1998 brokerage agreement which was at issue in the District Court. This Court remanded this matter to the District Court for supplemental findings of fact and conclusions of law based on the 1998 account agreement. Following an evidentiary hearing, the District Court granted Jones’ Motion to Compel Arbitration. Kloss now appeals from the order compelling arbitration. We reverse the order of the District Court.
¶2 Of the issues presented on appeal, we find the following to be dispositive:
¶3 1. Did the District Court err when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service Agreements were enforceable?
¶4 2. Did the District Court err when it failed to consider whether Defendants owed Kloss a fiduciary duty to explain the arbitration agreement?
¶5 3. Did the District Court err when it denied Kloss’ motion for attorney’s fees and costs?
FACTUAL BACKGROUND
¶6 The Appellant, Alice P. Kloss, is a 95 year old widow who was referred to Defendant Paul Husted in 1985. Husted has been employed by Defendant Edward D. Jones & Co. in Great Falls, Montana, as a stockbroker since 1981. Kloss opened a full service brokerage account with Jones on July 30, 1989, which permitted her to purchase securities and maintain a money market account.
¶7 Kloss established a living trust account with Jones in April of *126 1992. Like the 1989 account, the living trust account agreement contained a mandatory arbitration provision which required that “[a]ny controversy arising out of or relating to any of my accounts or transactions with you, your officers, directors, agents and or/employees ... shall be settled by arbitration ....”
¶8 In early 1998, Kloss went to Husted’s office to discuss investment options for a bond that had matured and Husted informed her that she had quite a bit of money and should set up a charitable trust with her bond proceeds. Husted then arranged for Kloss to meet with an attorney, who drafted the documents which created an irrevocable charitable trust.
¶9 On May 28,1998, Kloss activated the charitable trust account by executing a Customer Account Agreement for Full Service and Customer Loan Accounts (hereinafter 1998 Agreement). The 1998 Agreement also contained a pre-dispute arbitration clause but was not signed by Kloss. Rather, Kloss signed a detachable signature card that acknowledged she received a copy of the 1998 Agreement and incorporated the Agreement’s arbitration clause by reference:
The Full Service Account and the Customer Loan Account Agreements contain a pre-dispute arbitration clause that is incorporated by reference from the general account provisions on pages 1 and 2. By my signature below, I acknowledge that I have received a copy of this document.
The agreements themselves included the following explanations of rights waived by submission of disputes to arbitration:
The 1992 “Customer Account Agreements for Full Service and Customer Loan Accounts-General Account Provisions” contains a section as follows:
ARBITRATION
1. Arbitration is final and binding on the parties.
2. The parties are waiving their right to seek remedies in court, including the right to jury trial.
3. Pre-arbitration discovery is generally more limited than and different from court proceedings.
4. The arbitrators’ awards is not required to include factual findings or legal reasoning, and any party’s right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
5. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
¶10 After the charitable trust was executed, Husted selected and sold assets from Kloss’ living trust to fund the charitable trust. The assets *127 sold for approximately $352,000.00, which Husted deposited into a charitable remainder trust in the name of Alice P. Kloss.
¶11 In July 1998, Kloss began to have second thoughts about the charitable trust. She contacted her nephew and requested that he come to Montana, where she gave him power of attorney and decided to revoke the charitable trust. She then obtained counsel and filed a petition to revoke the charitable trust. After a hearing, Judge Kenneth Neill granted her petition.
¶12 Kloss then filed this complaint in the District Court for the Eighth Judicial District in Cascade County on December 28, 1998. Kloss alleged that Jones violated Montana statutes regarding the sale of securities, was negligent, committed unfair and deceptive business practices, breached its fiduciary obligations, and committed fraud. Kloss sought attorney fees, costs, expenses, and taxes incurred from the creation and revocation of the charitable trust. Jones filed a Motion to Compel Arbitration and Stay Proceedings on February 17, 1999. Evidentiary hearings were held on October 27,1999, and February 1, 2000.
¶13 On June 12, 2000, the Honorable Marge Johnson entered an Order granting Jones’ Motion to Compel Arbitration and Stay Proceedings, in spite of her finding that Kloss had not been provided with a copy of the 1992 Agreement. The 1998 Agreement was not discussed in Judge Johnson’s decision.
¶14 On July 6, 2000, Kloss appealed to the Montana Supreme Court and filed her initial brief. During the course of the appeal, however, Jones located the detached signature card that acknowledged Kloss’ receipt of the 1998 Agreement. Jones requested that the appeal be stayed so that the District Court could make supplemental findings of fact and conclusions of law based on the 1998 Agreement rather than the 1992 Agreement which was the subject of Judge Johnson’s Order.
¶15 On January 9, 2001, we remanded this case to the District Court for supplemental findings of fact and conclusions of law based on the 1998 Agreement. We additionally remanded Kloss’ Motion for Attorney’s Fees and Costs.
¶16 The District Court, the Honorable Julie Macek presiding, held an evidentiary hearing on March 20, 2001. On March 26, 2001, the District Corut issued an order which granted the Defendant’s Motion to Stay Proceedings and Compel Arbitration. On May 7, 2001, the District Court issued an order denying Kloss’ Motion for Attorney’s Fees and Costs. Kloss now appeals from these orders. We affirm in part and reverse in part the orders of the District Court.
*128 DISCUSSION ISSUE 1
¶17 Did the District Court err when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service Agreements were enforceable?
¶18 Both district judges concluded, based on slightly different reasoning, that the identical arbitration clauses found in the 1992 and 1998 contracts were binding and should be enforced. Before we can review the correctness of those conclusions, it is necessary to set forth the findings made by each district judge. Those findings are not challenged on appeal and are, therefore, assumed to be the determinative facts on which our opinion is based. Judge Johnson made the following relevant findings:
7. The Full Service Agreement was drafted by Edward Jones, and printed on an Edward Jones form. The document at issue is a form dated 12/91.
8. Clients do not have any input on the contents of the agreement. It is presented to them as is for their signature and they must sign the agreement as is if they wish to open an account with the Defendants.
9. While there are certainly other investment brokers in Great Falls, no evidence was presented which would lead me to believe Mrs. Kloss had any meaningful choice in accepting or rejecting an arbitration provision of such a contract or that other stockbrokers offered contracts at that time for similar accounts which did not contain an arbitration provision. I have no reason to believe that was not a fairly standard practice at that time, and that she had no meaningful choice regarding acceptance of the agreement if she wished to open an investment account, which is what I do believe and find as a fact.
10. The arbitration provision is a unilateral provision of the brokerage houses contained in a contract presented to clients as is with no meaningful opportunity to negotiate its presence in the contract .... It is reasonable to assume that such contracts commonly contain such a provision today, regardless of the brokerage house with which a client is dealing.
12. Mrs. Kloss liked and trusted Mr. Husted and expected that he would explain to her anything she needed to know that was significant.
13. She did have an opportunity to read the agreement before she *129 signed it, and was capable of doing so, but did not do so, relying instead upon Mr. Husted to advise her of the significant features of the agreement.
14. Mr. Husted, in opening accounts, such as that which Mrs. Kloss opened with him in 1992, explains what he believes to be the significant features from an investment perspective,....
15. Mr. Husted did not consider the arbitration provision to be a significant provision of the contract.
17. He [Husted] does not routinely explain and did not explain to Mrs. Kloss the arbitration provision of the contract.
18. She did not read and was not aware of the arbitration provision of the contract.
¶19 Judge Macek made the following findings which are relevant to our decision:
22. The Full Service Agreement [1998 Agreement] was drafted by and printed on an Edward D. Jones form.
23. Clients do not have input on the contents of said form. If clients wish to open a fall service account with Defendant they must sign the agreement.
24. Kloss had the opportunity to read the terms of the agreement before she signed it. Kloss did not do so.
25. Husted’s normal procedure in opening accounts, which he followed with Kloss, is to explain what he believes to be the significant features of the account from an investment perspective, ....
26. Husted did not consider the arbitration provision to be a significant provision of the contract.
28. Husted does not routinely explain the arbitration provision to clients and did not explain it to Kloss.
36. Edward D. Jones & Co. is engaged in interstate commerce. ¶20 In spite of what she found to be the facts, Judge Johnson concluded, based on our decision in Chor v. Piper, Jaffray & Hopwood, Inc. (1993), 261 Mont. 143, 862 P.2d 26, that Jones had no obligation to explain to Kloss the terms of its contract with her and that even if the contract in question was a contract of adhesion, it was not unenforceable because it was not unconscionable based on the criteria set forth in Iwen v. U.S. West Direct, 1999 MT 63, 293 Mont. 512, 977 P.2d 989. Judge Johnson did not draw any conclusion or make any *130 finding as to whether the arbitration provision was within Kloss’ reasonable expectations.
¶21 Following her findings, Judge Macek concluded that Jones had no duty to explain the terms of the contract based on our decision in Chor and that Kloss is presumed to have read and understood the terms of the contract. Judge Macek also concluded that the agreements in question were not contracts of adhesion because Kloss could have done business with other brokerage houses (Macek made no finding to contradict Johnson’s finding that the agreements at other brokerage houses would also have included an arbitration provision) and, finally, Judge Macek concluded that even if the agreements in question were contracts of adhesion, they were not unenforceable because they were within Kloss’ reasonable expectations and were not unconscionable pursuant to our decision in Iwen. Judge Macek concluded that the arbitration provisions were within Kloss’ reasonable expectations because they were included within the agreements.
¶22 On appeal, Kloss argues that the arbitration clause was part of a contract of adhesion and that waiver of her constitutional right to jury trial should not be presumed from signing a contract of adhesion. Jones contends that form contracts between securities brokers and their clients are not contracts of adhesion, nor are the arbitration clauses contained in such contracts unconscionable.
¶23 In Iwen, we were presented with the issue of whether an arbitration provision in an advertiser’s yellow page directory agreement was enforceable and barred the advertiser’s direct action in district court. We concluded first of all that a district court’s order compelling arbitration is subject to de novo review. Iwen, ¶ 17 (citing Zolezzi v. Dean Witter Reynolds, Inc. (9th Cir. 1986), 789 F.2d 1447). We acknowledged that pursuant to the Federal Arbitration Act, found at 9 U.S.C. §§ 1-16 (1998), arbitration provisions found in contracts affecting interstate commerce are valid “save upon such grounds as exist at law or in equity for the revocation of any contract.” See 9 U.S.C. § 2 (1998) and Iwen, ¶ 23. We also noted that while generally applicable contract law defenses may be used to set aside arbitration agreements, states may not craft special rules which only apply to arbitration provisions for the purpose of defeating arbitration. Iwen, ¶ 26. Finally, we stated that a generally applicable contract law defense arises in contracts of adhesion which will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party, or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, *131 unconscionable or against public policy. Iwen, ¶ 27. We ultimately concluded that the arbitration provision at issue in Iwen was unconscionable because it lacked mutuality. In other words, U.S. West retained the right to proceed in district court while Iwen was precluded from doing so.
¶24 A contract of adhesion is a contract whose terms are dictated by one contracting party to another who has no voice in its formulation. Corbin on Contracts, § 1.4 at 13 (1993). The law pertaining to contracts of adhesion is not merely an academic exercise in which we engage to resolve contract disputes. It is a recognition of the reality that contracts do not always reflect terms that were bargained for at arms length. Instead, terms are sometimes dictated by one party to another who has no bargaining power and no realistic options. The law pertaining to contracts of adhesion recognizes that in certain circumstances, traditional assumptions associated with contract law are unfounded. However, determining that a contract is a contract of adhesion is not the end of the inquiry in Montana. In Passage v. Prudential-Bache Securities, Inc. (1986), 223 Mont. 60, 727 P.2d 1298, we described contracts of adhesion in the securities context and the circumstances under which they are unenforceable.
Contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms. Here, the investor is faced with an industry wide practice of including Arbitration Clauses in standardized brokerage contracts. As the investor faces the possibility of being excluded from the securities market unless he accepts a contract with such an agreement to arbitrate, such clauses come within the adhesion doctrine. However, mere inequality in bargaining power does not render a contract unenforceable, nor are all standardized contracts unenforceable. As a consequence of current commercial realities, form forum clauses will control, absent a strong showing it should be set aside. For such a contract or clause to be void, it must fall within judicially imposed limits of enforcement. It will not be enforced against the weaker party when it is: (1) not within the reasonable expectations of said party or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable, or against public policy. [Citations omitted.]
Passage, 223 Mont. at 66, 727 P.2d at 1301-02 (quoting Finkle and *132 Ross v. A.G. Becker Paribas, Inc. (D.C.N.Y. 1985), 622 F.Supp. 1505, 1511-12).
¶25 We enforced the arbitration agreements in Passage because there was no evidence that they were not within the parties’ reasonable expectation nor was there evidence that they were unconscionable.
¶26 In Chor, we were again called on to decide whether arbitration provisions in securities agreements were contracts of adhesion and, if so, whether the arbitration clause is unconscionable. We concluded that the arbitration agreement was not a contract of adhesion because the consumer had testified that she had brokerage agreements with other firms which did not require her to arbitrate future disputes. We also held that the arbitration provision was clearly within Chor’s reasonable expectations based on her own testimony that she understood her obligation to arbitrate based on her review of the agreement. Finally, we concluded that the broker in that case had no obligation to explain the effect of the arbitration clause because a fiduciary duty had not been established. We held that:
In the absence of discretionary authority by a stockbroker to buy and sell in a customer’s account, no fiduciary relationship is created in a broker-customer relationship. Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb (9th Cir. 1985), 769 F.2d 561, 567.
Chor, 261 Mont. at 153, 862 P.2d at 32.
¶27 We conclude that both Passage and Chor are distinguishable, based on their facts, from this case. First, based on Judge Johnson’s findings which are neither appealed nor contradicted by Judge Macek’s findings, Kloss’ agreements with Jones are clearly contracts of adhesion. They were standardized forms prepared by Jones and presented to Kloss who had no opportunity to negotiate the terms of the contracts if she chose to invest through Jones. Furthermore, the arbitration clause was found by Judge Johnson to be an industry-wide practice. Kloss would have been excluded from the securities market unless she accepted the agreement to arbitrate.
¶28 Furthermore, unlike the facts in Passage and Chor, the District Court’s findings clearly establish that the arbitration provision by which Kloss waived her right of access to this State’s courts, her right to a jury trial, her right to reasonable discovery, her right to findings of fact based on the evidence, and her right to enforce the law applicable to her case by way of appeal were clearly not within Kloss’ reasonable expectations. Kloss relied on Husted to explain to her anything in the contract that was significant. Husted, in fact, admitted *133 that his normal practice when opening accounts was to explain significant features of the account to the investor. However, he did not explain the arbitration provision (a provision by which Kloss waived at least two constitutional rights, i.e., a right of access to the courts pursuant to Article II, Section 16, and her right to a jury trial pursuant to Article II, Section 26 of the Montana Constitution) to Kloss. Finally, based on the routine practice between the parties, Kloss did not read the contract and was not aware of the arbitration provision in the contract.
¶29 Judge Macek’s conclusion that the arbitration provision was within Kloss’ reasonable expectation simply because it was contained in the contract that she signed would defeat the protections provided by principles of law pertaining to contracts of adhesion. If the only question was whether the written terms of a contract included the challenged provision, reasonable expectations would never become an issue. Contracts of adhesion would always be enforced based on their plain language without regard to what the consumer knew or understood. However, that is not the law pertaining to contracts of adhesion as previously set forth in our prior decisions which apply to any contract.
¶30 We have also been asked to conclude on appeal that the arbitration provisions found in Kloss’ agreements with Jones are unconscionable. However, having concluded that the agreements were not within Jones’ reasonable expectations, we need not reach the issue of conscionability. Furthermore, as a guide to future litigants who raise the issue of conscionability in the context of arbitration provisions, we take this opportunity to state that that issue cannot be decided without a more fully developed record. We have set forth the factors to be considered in liven, however, a number of factual issues should be addressed before those factors can be appropriately applied. For example:
1. Are potential arbitrators disproportionately employed in one or the other party’s field of business?
2. Do arbitrators tend to favor “repeat players” as opposed to workers or consumers who are unlikely to be involved in arbitration again? In other words, is there a tendency by arbitrators to avoid decisions which will result in the loss of future contracts for their services?
3. What are the filing fees for arbitration compared to the filing fees in Montana’s district courts?
4. What are arbitrators’ fees? Do they make small claims *134 prohibitive? Do they discriminate against consumers or workers of modest means?
5. Are arbitration proceedings shrouded in secrecy so as to conceal illegal, oppressive or wrongful business practices?
6. To what extent are arbitrators bound by the law?
7. To what extent are arbitrators bound by the facts?
8. What opportunity do claimants have to discover the facts necessary to prove a claim such as a company’s business practices?
¶31 These are all issues which we consider relevant to the ultimate issue of whether an arbitration provision in a contract of adhesion is oppressive or unconscionable. Therefore, we would advise future claimants not to come to this Court with claims of oppression or unconscionability unless the record in regard to these issues has been adequately developed.
¶32 For these reasons we conclude, based on generally applicable contract law defenses, that the District Court erred when it concluded that the arbitration clauses contained in the 1992 and 1998 Full Service agreements were enforceable.
ISSUE 2
¶33 Did the District Court err when it failed to consider whether Defendants owed Kloss a fiduciary duty to explain the arbitration agreement?
¶34 Kloss contends that the District Court erred when it found that the parties were dealing at arms length and that the Defendants consequently had no obligation to explain the arbitration provision. According to Kloss, Husted had a fiduciary relationship with Kloss because he had the discretion to trade securities in her account. The Defendants argue that Husted did not have the discretion to trade in Kloss’ account and that Kloss misreads the provision which she claims gave Husted discretionary authority.
¶35 Whether Kloss and Husted, as broker and client, enjoyed a fiduciary relationship is highly fact intensive. “The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the scope or extent of the fiduciary obligation, which depends on the facts of the case.” Duffy v. Cavalier (1989), 215 Cal. App. 3d 1517, 1535, 264 Cal.Rptr. 740, 752. In Chor, we held that although § 30-10-301(1), MCA, may create an implied code of conduct for brokers, a violation of which may constitute a breach of the duty the broker owes to a client, that duty is not necessarily fiduciary in nature. “In the absence of discretionary *135 authority by a stockbroker to buy and sell in a customer’s account, no fiduciary relationship is created in a broker-customer relationship.” Chor, 261 Mont. at 153, 862 P.2d at 32. Therefore, pursuant to our analysis in Chor, a fiduciary relationship is created whenever a broker has discretion to buy and sell in the client’s account.
¶36 Here, Jones and Husted had discretion to buy and sell securities in Kloss’ account pursuant to the 1992 Agreement. Specifically, the “Liquidation of Collateral or Account” section of the Agreement states:
You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice, in the event of my death or whenever in your discretion you consider it necessary for your protection.
Furthermore, Kloss testified that Husted exercised that discretion when he selected and sold securities from her account to fund the newly created charitable trust without consulting her regarding which securities to sell.
¶37 Therefore, based on the plain language of the Agreement and Husted’s selection and sale of securities in Kloss’ account, we conclude that Kloss and Husted had a fiduciary relationship. In the words of Chief Judge Cardozo of the Court of Appeals of New York, a fiduciary duty is “the duty of the finest loyalty” and encompasses “[n]ot honesty alone, but the punctilio of an honor the most sensitive.” Meinhard v. Salmon (1928), 249 N.Y. 458, 463-64, 164 N.E. 545, 546. In light of the substantial fiduciary obligations owed to his client, Husted should have explained the arbitration clause, a clause which effectively waived the constitutional rights of a 95 year old widow with no bargaining power and a relative lack of sophistication in such matters. However, as the District Court found, Husted did not consider the arbitration provision to be a significant provision of the contract and therefore did not explain the arbitration provision to Kloss. The irony of the Defendants’ position is not lost on this Court, as the supposedly insignificant arbitration provision they now seek to enforce to the detriment of Kloss’ constitutionally protected rights of access to court and trial by jury is now squarely at the center of this appeal.
¶38 We hold that Husted owed Kloss a fiduciary duty which included explaining the consequences of the arbitration provision Jones now seeks to enforce. Accordingly, we conclude that the District Court erred when it failed to consider whether a fiduciary duty existed.
ISSUE 3
¶39 Did the District Court err when it denied Kloss’ motion for *136 attorney’s fees and costs?
¶40 Kloss contends that the District Court erred when it denied the claim for the opportunity to conduct discovery in an effort to prove that Kloss was entitled to attorney fees based on Jones’ untimely disclosure of the detachable signature card. That issue was remanded to the District Court, which according to Kloss, should have made the determination of whether she was entitled to attorney fees.
¶41 Jones responds that the District Court did not err when it denied discovery on the attorney fee issue after reading the entire file, including prior transcripts and court orders. Jones contends that the District Court had the discretion to conclude that further evidence of the issue of attorney fees was unnecessary.
¶42 Attorney fees and costs may be awarded when:
An attorney or party to any court proceeding who, in the determination of the court, multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct.
§ 37-61-421, MCA.
¶43 In its May 7, 2001, Order, the District Court found that the Defendants did not unreasonably or vexatiously multiply the proceedings. After reviewing the record, we conclude that the District Court’s finding was not clearly erroneous. Consequently, we affirm the District Court’s order denying the motion for attorney fees and costs.
¶44 This case is remanded to the District Court for further proceedings consistent with this opinion.
JUSTICES COTTER, NELSON and LEAPHART concur.