JUSTICE NELSON
specially concurs.
¶79 I concur in our Opinion. Before discussing the substance of my special concurrence, however, I am compelled to address Chief Justice Gray’s contention that our Opinion-and presumably my special concurrence-violate the “law of the case” doctrine as regards our discussion and holding on due process. I agree that the law of the case doctrine is an important rule; it is axiomatic that we have applied it many times. Notwithstanding, this doctrine is not applicable in the present situation given the posture of this case vis-a-vis Dorwart I. First the law.
¶80 In her dissent, Chief Justice Gray relies on Calcaterra v. Montana Resources, 2001 MT 193, ¶ 9, 306 Mont. 249, ¶ 9, 32 P.3d 764, ¶ 9, for the proposition that under the law of the case doctrine, an earlier decision by this Court resolving a particular issue between the same parties in the same case is binding and cannot be relitigated. However, Calcaterra also stated that “the doctrine of law of the case is not inviolable and that there may be exceptions to the application of the doctrine.” Calcaterra, ¶ 12 (citing State v. Gilder, 2001 MT 121, ¶ 13, 305 Mont. 362, ¶ 13, 28 P.3d 488, ¶ 13). We set forth one such exception in State v. Zimmerman (1977), 175 Mont. 179, 185, 573 P.2d 174, 178, wherein we noted that
an exception to this general rule [of the law of the case] exists where the case must be remanded to the District Court for further *24 proceedings because of reversal on an unrelated issue. In such case this Court may correct a manifest error in its former opinion and announce a different ruling to be applied prospectively to future proceedings in the case. This exception to the general rule is recognized in Montana at least since 1955 when we held that the law of the case announced in the first appeal, and which governed the second trial, does not prevent the appellate court from correcting a manifest error in its former opinion to apply to future proceedings where doing so promised justice without substantial injury to anyone. State v. Hale (1955), 129 Mont. 449, 291 P.2d 229. Such exceptions are more readily applied where, as here, the prior decision is by a divided court. Perkins v. Kramer (1948), 121 Mont. 595, 198 P.2d 475.
¶81 Moreover, one of the cases cited by Chief Justice Gray in authoring Calcaterra noted the following comment on the law of the case doctrine by Justice Oliver Wendell Holmes:
In the absence of statute the phrase, law of the case, as applied to the effect of previous orders on the later action rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.
Gilder, ¶ 11 (quoting Messenger v. Anderson (1912), 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152) (emphasis added).
¶82 Chief Justice Gray also maintains in her dissent that “the law of the case doctrine prohibits the Court’s remand of the state constitutional due process claim at this point.” On the contrary, in several of this Court’s prior decisions, we recognized that the application of the law of the case doctrine
is limited to those issues which were actually decided and were necessary to the decision. The doctrine does not extend so far as to include matter which was consequential, incidental, or not decided by the court. [Emphasis added.]
Phalen v. Rilley (1970), 156 Mont. 91, 93, 475 P.2d 998, 999 (quoting O’Brien v. Great Northern R. Co. (1966), 148 Mont. 429, 439-40, 421 P.2d 710, 716). See also Sanders v. State, 1998 MT 62, ¶ 16, 288 Mont. 143, ¶ 16, 955 P.2d 1356, ¶ 16. In the case subjudice, Dorwart’s claim for damages for violating his right to due process was ignored in Dorwart I and, on remand, the District Court refused to address the issue because this Court failed to address it in Dorwart I. Thus, that issue was never decided. The law of the case doctrine, therefore, does not apply.
¶83 With that said, I turn to my separate Opinion. Our resolution of *25 this cause using Bivens v. Six Unknown Named Agents (1971), 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, and the common law as components of the analytical construct for our decision is appropriate given the manner in winch the arguments on appeal were framed by the parties and given the present state of the law.
¶84 Nonetheless, for reasons hereinafter discussed, I firmly believe that, independent of any federal jurisprudence, federal constitutional authority, the common law, or other authority, the foundation for private causes of action for damages for constitutional violations is found in the language of Montana’s 1972 Constitution and in the proceedings of the Constitutional Convention. I suggest that it is important to acknowledge this principle, because the greater guarantees of individual rights afforded by Montana’s Constitution may be neither bounded nor frustrated by federal court decisions which, with seeming increasing frequency, are weakening similar protections of the federal constitution. See Trankel v. Department of Military Affairs (1997), 282 Mont. 348, 362, 938 P.2d 614, 623 (holding that the sentence in Article II, Section 16, Constitution of Montana, that guarantees an employee the right of full legal redress against third parties is mandatory and self executing and “leaves no room for erosion based on what federal courts or the courts of other states would do pursuant to federal laws or the laws of other states.”).
¶85 Moreover, Montana’s Constitution guarantees rights that are not provided for in the federal constitution-the right to a clean and healthful environment, the right to pursue life’s basic necessities, the right to enjoy and defend one’s life and liberties (all protected under Article II, Section 3); the right of dignity (Article II, Section 4); the right of public participation in the operation of governmental agency decision making (Article II, Section 8); the right to examine government documents and to observe the deliberations of government entities (Article II, Section 9); the right of individual privacy (Article II, Section 10); the rights of persons not adults (Article II, Section 15); the right of access to the courts and to full legal redress (Article II, Section 16); the waiver of sovereign immunity (Article II, Section 18); rights regarding the initiation of criminal proceedings, criminal detention, imprisonment for debt and rights of the convicted (Article II, Sections 20, 23, 27 and 28 respectively); the right to an award of attorney fees in eminent domain cases (Article II, Section 29); and others.
¶86 In point of fact, Professors Larry Elison and Fritz Snyder state that seventeen of Montana’s Declaration of Rights have no parallel in the Bill of Rights of the U.S. Constitution. Larry M. Elison and Fritz *26 Snyder, The Montana State Constitution: AReference Guide, 20 (2001) (hereinafter ELISON) (citing Ronald K. L. Collins, Reliance on State Constitutions-The Montana Disaster, 63 Tex. L.Rev. 1095, 1122 (1985)). Thus, it is important that the right of direct action to protect these distinctive Montana constitutional rights not be restricted by jurisprudence that is limited to a few constitutional rights that are common to both the constitutions of the United States and Montana.or that were historically actionable at common law.
¶87 As stated in Dorwart I, the constitutional rights violated in the case at bar were those guaranteeing the right to be free from unreasonable searches and seizures under the Fourth Amendment and Article II, Sections 10 and 11 of Montana’s Constitution and the right to due process of law protected by the Fourteenth Amendment and Article II, Section 17. At least as the federal law now stands, Bivens and the line of cases following it support our decision here to create a remedy for the violations of these rights.
¶88 In Bivens, the United States Supreme Court, recognizing for the first time an implied private remedy for a constitutional tort, held that the victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. Bivens, 403 U.S. at 396-97, 91 S.Ct. at 2004-05. As stated in our Opinion, in the decade following, the Court extended Bivens to include an implied damages remedy for violation of the Fifth Amendment Due Process Clause (Davis v. Passman (1979), 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846) and for violation of the guarantee against cruel and unusual punishment under the Eighth Amendment (Carlson v. Green (1980), 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15).
¶89 However, since Carlson, the Supreme Court has consistently refused to extend Bivens to cover violations of any new constitutional torts or any new category of defendants. Correctional Serv. Corp. v. Malesko (2001), 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456. In Correctional Services the Court refused to extend Bivens to authorize a right of action for damages against a private entity (there a private prison operated under contract to the federal Bureau of Prisons), even though the corporation was acting under color of federal law. Correctional Services, 534 U.S. at_, 122 S.Ct. at 519. The Court made it clear that Bivens is to deter individual federal officers from committing constitutional violations and that the Court created and twice extended the otherwise nonexistent cause of action only to provide a remedy for a plaintiff “who lacked any alternative remedy for harms caused by an individual officer’s unconstitutional conduct.” Correctional Serv., 534 U.S. at_, 122 S.Ct. at 521 (emphasis in *27 original).
¶90 Even that, in my estimation, overstates the present Court’s view of Bivens. One cannot read Correctional Services and the cases cited therein[1] without coming away with the conclusion that Bivens is and will be limited to violations of constitutional rights under the Fourth and Eighth Amendments and in some cases under the Fifth Amendment (Due Process Clause). And, even in those instances, the Court will likely carefully scrutinize the circumstances of each case and, if it applies Bivens at all, it will do so as narrowly as possible. The Court is, and, at least as presently constituted, will be very reticent to expand Bivens to other constitutional guarantees or to other classes of defendants.
¶91 Indeed, in his concurring opinion, Justice Scalia, joined by Justice Thomas, stated that he would not extend Bivens even if the narrowest rationale of that case arose in a new context. Not mincing words, Justice Scalia relegated Bivens to the status of “a relic of the heady days in which [the] Court assumed common-law powers to create causes of action-decreeing them to be ‘implied’ by the mere existence of a statutory or constitutional prohibition.” Correctional Serv., 534 U.S. at_, 122 S.Ct. at 523-24 (Scalia, J., concurring).
¶92 Given this direction of the U.S. Supreme Court, Bivens eventually may well be interpreted out of any meaningful existence. Moreover, as noted, Bivens is already limited to constitutional torts committed by governmental officers under color of law; involving searches and seizures, cruel and unusual punishment or some due process violations; and where the injured person lacks an alternative remedy. These limitations make it analytically difficult to provide citizens with the broader and, in some cases, unique, protections afforded by Montana’s Constitution should a case arise in some other context; involve some other class of defendant or injured plaintiff; involve a constitutional right not historically actionable under common law; *28 involve a right where the common law remedy has been superseded or suspended by statute; or involve a right for which the statutory remedy created is inadequate.
¶93 Therefore, I believe that it is important to address an equally compelling rationale for our decision to recognize that there is a direct, private right of action for state constitutional violations. This alternate rationale is derived from the language of Montana’s Constitution, independent of federal jurisprudence and federal constitutional authority; independent of the common law; and independent of statute. It is to that, I now turn.
¶94 In his amicus curiae brief, Wade Dahood, Esq., formerly the Chairman of the Bill of Rights Committee (Committee) at the Constitutional Convention, argues persuasively that when the Constitution’s “Declaration of Rights was framed, [the Committee] intended it to stand on its own footing and to provide individuals with fundamental rights and protections far broader than those available through the federal system.” This statement is supported by reference to the Committee’s February 22, 1972 transmittal letter to the Convention delegates which states that “new safeguards” had been added to the Declaration [Bill] of Rights “to meet the changing circumstances of contemporary life” and that:
In presenting this proposed Declaration of Rights, the committee notes that the guidelines and protections for the exercise of liberty in a free society come not from government but from the people who create that government.
It is that spirit which has motivated this committee to insure for Montana’s future, through this bill of rights, a more responsible government that is Constitutionally commanded never to forget that government is created solely for the welfare of the people so that the people can more fully enjoy the heritage of American liberty within the structure of that government.
Montana Constitutional Convention, Bill of Rights Committee Proposal, Vol. II, 619 (emphasis added).
¶95 Taking these admonitions to heart, this Court has, for example, applied the broader protections of Montana’s Constitution in a number of contexts involving individual privacy (Gryczan v. State (1997), 283 Mont. 433, 942 P.2d 112) and personal autonomy (Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364); involving search and seizure (State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61; State v. Siegal (1997), 281 Mont. 250, 934 P.2d 176; State v. Elison, 2000 MT 288, 302 Mont. 228, 14 P.3d 456); involving the environment (Montana Envtl. Info. Ctr. v. Department of Envtl. Quality, 1999 MT 248, 296 *29 Mont. 207, 988 P.2d 1236); and involving the right of participation and the right to know (Common Cause v. Statutory Comm. to Nominate Candidates for Comm’r of Political Practices (1994), 263 Mont. 324, 868 P.2d 604; Great Falls Tribune Co. v. Great Falls Pub. Schs. (1992), 255 Mont. 125, 841 P.2d 502; Associated Press v. Board of Pub. Educ. (1991), 246 Mont. 386, 804 P.2d 376; Jarussi v. Board of Trustees (1983), 204 Mont. 131, 664 P.2d 316).
¶96 Furthermore, and acknowledging the Committee’s statement that no part of the Constitution is more important, Montana Constitutional Convention, Vol. II, 619, we have repeatedly recognized the rights found in Montana’s Declaration of Rights as being “fundamental,” Butte Community Union v. Lewis (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311, meaning that these rights are significant components of liberty, any infringement of which will trigger the highest level of scrutiny, and, thus, the highest level of protection by the courts. Kloss v. Edward D. Jones & Co., 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54 P.3d 1, ¶ 52 (Nelson, J., concurring).
¶97 We have also observed the obvious logical corollary to these rules: “[constitutional rights that cannot be enforced are illusory. It is as if those rights cease to exist as legal rights.” Kloss, ¶ 58 (Nelson, J., concurring). The importance of being able to enforce one’s constitutional rights through the courts and to receive meaningful redress for public or private injury cannot be overstated. If an individual’s constitutional rights can be violated by the government, by the government’s officers, or, where so protected, by a private person, secure in the knowledge nothing will come of the wrongdoing, then it follows that the constitution provides no protection at all. It is but a collection of elegant words without substance; it is a shield made of little more than aspirations and hopes.
¶98 As Attorney Dahood argues in his amicus brief, in order to avoid this result and in order to give Montana’s constitutional guarantees teeth, the framers intended that the people retain the ability to protect their rights-both enumerated and unenumerated-through direct actions in the courts. This conclusion follows from the Committee’s proposal of Article II, Section 34 to the Convention delegates and the subsequent adoption of this provision. Article II, Section 34 states:
Unenumerated rights. The enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.
*30 ¶99 In proposing the adoption of this Section,[2] the Committee did two things. First, it recognized that the rights enumerated in Montana’s Constitution were not exclusive-i.e. that there are unenumerated rights or “rights beyond those specifically listed” which are retained by the people. Montana Constitutional Convention, Vol II., 645. Second, and important for our purposes here, the Committee considered this Section to be "... a crucial part of any effort to revitalize the state government’s approach to civil liberties questions ... [and that this Section]... may be the source of innovative judicial activity in the civil liberties field.” Montana Constitutional Convention, Vol II., 645.
¶100 The proceedings of the Constitutional Convention reveal no debate on Article II, Section 34. It was adopted unanimously on the straightforward, yet eloquent recommendation of Delegate Eck, who stated: “I think that [this Section] is completely self-explanatory. There are rights which are not enumerated which the people of Montana should not be denied.” Montana Constitutional Convention, Verbatim Transcript, Vol VI, 1832.
¶101 Professors Elison and Snyder observe that the Committee’s belief that Article II, Section 34 could be the source of “innovative judicial activity’ in the area of civil liberties has not been realized; that there are no cases referencing or interpreting this Section. Elison, 86. While technically inaccurate that no cases have referenced this Section,[3] it is true that this Court has not applied Article II, Section 34 in any substantive context.
¶102 Professors Elison and Fritz suggest that:
[t]he section could be used as the basis for the introduction of a theory of natural law or an expansion of the use of substantive due process or judicial finding of unstated individual rights hidden in the self-reliant, free-thinking, idiosyncratic Montanan mythology. Presumptively, this could limit state police power and enlarge existing rights or create new rights. ... While plenary state legislative power and unenumerated rights might appear to be in conflict or contradictory, they are not. In a state constitution *31 a provision on unenumerated rights as a balance against state police power is a potentially useful idea, but something of an anomaly. Historically, within the context of state governments in a federal system, the limitations on plenary legislative power are the specific prohibitions and restrictions found in a constitutional declaration of rights. Adding unenumerated rights to specific prohibitions and restrictions could transfer to the people indirectly, and to the courts directly, additional means of checking plenary legislative power.
ELISON, 87 (emphasis added).
¶103 Frankly, I can think of no better application of Article II, Section 34 than in the case at bar.
¶104 As the Committee recognized, the “protections for the exercise of liberty in a free society come not from government but from the people who create that government [and that] government is created solely for the welfare of the people.” Montana Constitutional Convention, Vol. II, 619 (emphasis added). Indeed, Article II, Section 1 of the Constitution of Montana could not be more clear:
All political power is vested in and derived from the people. All government of right originates with the people, is found upon their will only, and is instituted solely for the good of the whole.
(Emphasis added).
¶105 The intent of the framers and the language of the Constitution is incontrovertible: all government is derived from and originates with the people; government is created and instituted solely for the good and welfare of the people. Thus, and with those core principles in mind, it makes perfect sense that, as they did in Article II, Section 34, the people would retain unto themselves rights beyond those which are enumerated in their Constitution. Recognizing that they are the wellspring of all government which they choose to impose upon themselves, the people also positively declared their intent not to restrict their liberties to those textually set out in their Constitution.
¶106 Correspondingly, it takes no leap of logic to conclude that one of the unenumerated rights which the people would necessarily retain is the power-the right, if you will-to protect from government infringement their ability to fully exercise those liberties which they specifically guaranteed unto themselves in their Declaration of Rights.
¶107 As already noted, constitutional rights that cannot be enforced are illusory; they simply cease to exist; they offer no protection whatsoever. Therefore, it follows that to ensure that the government which they created did not, like Frankenstein’s monster, turn on its creator, the people would, as they did, implicitly retain the right to *32 directly access the courts to protect and enforce their other constitutional liberties.
¶108 Among others, the people guaranteed unto themselves fundamental rights to due process of law, to be free from unreasonable searches and seizures, to individual privacy and to access and redress in their courts. The best-and more likely, the only-protection that the people could reserve unto themselves to make sure that the government, its agents, and in some cases, their fellow citizens did not outright violate or inexorably chip away at these rights, was to also guarantee their right to sue directly for these sorts of violations.
¶109 Indeed, if the people had not necessarily retained this right, then there is nothing to stop the government from disparaging the peoples’ constitutional liberties and then fixing that impairment by prohibiting or limiting the people from seeking relief and redress in the courts. The government would no longer derive from and originate with the people; rather, government would originate with the government. The people would no longer have the power to enforce and protect their constitutional liberties; rather, they would be dependent upon the government for that protection and with that, whatever limitations, restrictions and impairments the government chose to impose on that protection. In short, without retaining the right of direct action for constitutional violations, the core premise under which the people adopted their Constitution-that government derives from and originates with them-would, itself, be meaningless, because it could not be enforced.
¶110 For these reasons, I would hold that the people have reserved unto themselves under Article II, Section 34 of the Constitution of Montana, the unenumerated right to sue their government, its agents, and, in some cases, their fellow citizens, directly in the courts of this state for violations of their fundamental rights protected under Montana’s Constitution.
¶111 Moreover, I would hold that this unenumerated right of direct action for damages for constitutional violations is a stand-alone right guaranteed by Article II, Section 34, independent of the enumerated rights of access to the courts and to full legal redress guaranteed by Article II, Section 16 and independent of the right to defend one’s life and liberties guaranteed by Article II, Section 3. Indeed, Article II, Section 34 unambiguously makes this distinction in providing that the enumeration of certain rights in the constitution “shall not be construed to deny, impair or disparage others retained by the people.”
¶112 In my view, the real efficacy of this Article II, Section 34 cause of action is to ensure that the enumerated fundamental rights are *33 protected from diminution, limitation and restriction. This stand-alone right of direct action for constitutional violations would protect the most basic and most important rights that Montanans enjoy. These are the rights that:
shield ... each individual from the excesses of government, from the tyranny of the majority, and from the sorts of abuses perpetrated by persons, firms, corporations, associations, organizations, and institutions that, in pursuit of their own interests and agenda, effectively would deprive the people of those things essential to their humanity and to their lawful individual pursuits.
Associated Press, ¶ 55 (Nelson, J., concurring).
¶113 Returning to Attorney Dahood’s amicus brief, he states:
In placing Article II, Sec. 34 in the 1972 Constitution, the framers wanted to make clear that it was “crucial” that the judiciary had the power to recognize unenumerated rights when necessary to protect and secure those which are enumerated. A direct cause of action to protect the specified rights is one of those “unenumerated rights.”
I could not agree more.
¶114 I concur in our Opinion. I also believe that Montana’s Constitution contains within it’s own provisions a heretofore untapped source of authority-Article II, Section 34-guaranteeing to the people, by their own reservation, an unenumerated, yet fundamental, right of direct action for constitutional violations.
JUSTICE TRIEWEILER concurs in the foregoing special concurrence.

 See Bush v. Lucas (1983), 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (Court declined to create a Bivens remedy for First Amendment violation); Chappell v. Wallace (1983), 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (Court declined to allow enlisted military personnel a Bivens-type remedy against their superior officers); United States v. Stanley (1987), 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (no Bivens remedy available for injuries that arise out of military activity “incident to service”); Schweiker v. Chilicky (1988), 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (Court declined to infer damages action against individual government employees alleged to have violated due process in handling of Social Security claims); FDIC v. Meyer (1994), 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (Court declined to extend Bivens to permit suit against federal agency, even though the agency was amenable to suit because Congress had waived sovereign immunity).

 This provision was formerly included as Article III, Section 30 of the 1889 Constitution of Montana.

 Article II, Section 34, was mentioned in Mountain States Tel. & Tel. Co. v. Department of Pub. Serv. Regulation (1981), 194 Mont. 277, 282, 634 P.2d 181, 184; in Associated Press, Inc. v. Department of Revenue, 2000 MT 160, ¶ 62, 300 Mont. 233, ¶ 62, 4 P.3d 5, ¶ 62 (Nelson, J., concurring); and in Harper v. Greely (1988), 234 Mont. 259, 262, 763 P.2d 650, 652 (citing to Mr. Justice Sheeh/s reference to the Section in his concurring opinion in Butte Community Union, 219 Mont. at 435; 712 P.2d at 1314).