No. 04-390

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 69

COLUMBIA FALLS ELEMENTARY SCHOOL DISTRICT NO. 6 and
H.S. DISTRICT NO. 6; EAST HELENA ELEMENTARY DISTRICT
NO. 9; HELENA ELEMENTARY DISTRICT NO. 1 and H.S.
DISTRICT NO. 1; BILLINGS ELEMENTARY DISTRICT NO. 2 and
H.S. DISTRICT NO. 2; WHITE SULPHUR SPRINGS  ELEMENTARY
DISTRICT NO. 8 and H.S. DISTRICT NO. 8; TROY ELEMENTARY
DISTRICT NO. 1 and H.S. DISTRICT NO. 1; MEA-MFT; MONTANA
SCHOOL BOARDS ASSOCIATION; MONTANA RURAL
EDUCATION ASSOCIATION; SCHOOL ADMINISTRATORS OF
MONTANA; ALAN & NANCY NICHOLSON; GENE JARUSSI;
PETER & CHERYL MARCHI; and MICHAEL & SUSAN NICOSIA,
for themselves and as parents of their minor children,

    Plaintiffs, Respondents and Cross- Appellants,

 v.

THE STATE OF MONTANA,

    Defendant and Appellant.

APPEAL FROM: The District Court of the First Judicial District,
      In and For the County of Lewis and Clark, Cause No. BDV 2002-528,
      Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

      Honorable Mike McGrath, Attorney General; Brian Morris (argued),
      Solicitor; Ali Bovingdon (argued), Assistant Attorney General,
      Helena, Montana

   For Respondents:

      James P. Molloy (argued), Molloy Law Firm, Helena, Montana

      Brian K. Gallik, Goetz, Gallik & Baldwin, Bozeman, Montana

   For Amicus Curiae:

      Stephen A. Doherty and Patrick L. Smith, Smith, Doherty & Belcourt,
      Great Falls, Montana (Montana Indian Education Association)

          Heard and Submitted:  October 20, 2004
             Decided:   March 22, 2005

Filed:

            Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      The State appeals from the District Court's order determining that the State of Montana's public school system violates Article X, Section 1(3), of the Montana Constitution. This Court issued an order on November 9, 2004, affirming the District Court. This opinion supersedes that order.

¶2      We restate the issues as follows:

¶3      1. Whether a challenge to the adequacy of the State's funding of a basic system of free quality public elementary and secondary schools presents a non-justiciable political question.

¶4      2. Whether the District Court erroneously concluded that the current school funding system violates Article X, Section 1(3), by failing to provide adequate funding for Montana's schools.

¶5      3. Whether the District Court erred in concluding that the State has violated Article X, Section 1(3), by not paying its share of the cost of the public school system.

¶6      4. Whether the District Court erred in concluding that the State has violated Article X, Section 1(2), by not recognizing the cultural heritage of American Indians in its educational goals.

¶7      5. Whether the October 2005 effective date of the District Court's opinion should be moved up to May 2005.

¶8      6. Whether the current school funding system violates the Equal Protection Clause of the Montana Constitution.

2

¶9    7. Whether an award of attorney fees is appropriate.

## BACKGROUND

¶10    A coalition of schools, education groups, and parents (the Coalition) brought this action contending that the State has acted unconstitutionally in administering and funding Montana's constitutionally-mandated public school system. After a three-week trial, the District Court found serious problems with the current school system, relating both to the manner in which the State funds its public schools and the educational product the schools are delivering. The District Court concluded that the current system violates the Public Schools Clause of Article X, Section 1(3), and the Indian Education Clause of Article X, Section 1(2). The District Court also concluded that the current school system does not violate the Equal Protection Clause of the Montana Constitution and that the Coalition should not be awarded attorney fees.

¶11    The State now appeals, arguing that we cannot reach the issue whether the current school system violates Article X, Section 1(3), because the issue is a political question. In the alternative, the State argues that the District Court wrongly concluded that the current school system violates Article X, Section 1(3). The Coalition cross-appeals, arguing that the court erred in concluding that the current school system does not violate Montana's Equal Protection Clause, that the effective date of the court's opinion should be moved from October 1, 2005, to May 1, 2005, and that the court erred in not awarding attorney fees. We conclude that, since the Legislature has implemented Article X, Section 1(3), the question whether the system it created violates the Constitution is not a political question. We affirm

3

the court's determination that the current system violates Article X, Section 1(3), but we also defer to the Legislature for the definition of "quality" as used in that constitutional provision. Furthermore, we affirm the effective date of the District Court's opinion and vacate and remand the issue of attorney fees.

## STANDARD OF REVIEW

¶12    Whether an issue presents a non-justiciable political question is a legal conclusion that this Court reviews de novo. *Northfield Ins. Co. v. Montana Ass'n of Counties*, 2000 MT 256, ¶ 8, 301 Mont. 472, ¶ 8, 10 P.3d 813, ¶ 8. We review a district court's findings of fact to determine whether they are clearly erroneous, *In re Estate of James*, 2004 MT 314, ¶ 9, 324 Mont. 24, ¶ 9, 102 P.3d 12, ¶ 9, and a district court's discretionary rulings, such as the award or denial of attorney fees, for abuse of discretion. *Johnson v. Hamilton*, 2003 MT 199, ¶ 9, 317 Mont. 24, ¶ 9, 75 P.3d 778, ¶ 9; *Mortgage Source, Inc. v. Strong*, 2003 MT 205, ¶ 8, 317 Mont. 37, ¶ 8, 75 P.3d 304, ¶ 8.

## DISCUSSION

### ISSUE ONE

¶13    *Whether a challenge to the adequacy of the State's funding of a basic system of free quality public elementary and secondary schools presents a non-justiciable political question.*

¶14    The State, relying on *Baker v. Carr* (1962), 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686, asserts that questions arising under Montana Constitution Article X, Section 1(3), are non-justiciable under the political question doctrine. That section provides:

"The legislature shall provide a basic system of free quality public elementary and secondary schools." Of course, in interpreting our own Constitution, this Court need not defer to the United States Supreme Court. *State v. Jackson* (1983), 206 Mont. 338, 342, 672 P.2d 255, 257. Nonetheless, given the dearth of Montana precedent on the political question doctrine and the State's reliance on federal doctrine, we look to the federal precedent for guidance in developing our own doctrine.

¶15 Both the United States Supreme Court and this Court recognize that non-self-executing clauses of constitutions are non-justiciable political questions. *Baker*, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686 (listing one factor of the federal political question doctrine as "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"); *State ex rel. Stafford v. Fox-Great Falls Theatre Corp.* (1942), 114 Mont. 52, 73, 132 P.2d 689, 700.

¶16 To determine whether the provision is self-executing, we ask whether the Constitution addresses the language to the courts or to the Legislature. *Stafford*, 114 Mont. at 73, 132 P.2d at 700. If addressed to the Legislature, the provision is non-self-executing; if addressed to the courts, it is self-executing. *Stafford*, 114 Mont. at 73-74, 132 P.2d at 700. Louisiana's Constitution once provided that "Gambling is a vice and the Legislature shall pass laws to suppress it." *State v. Mustachia* (La.1922), 94 So. 408, 409. In *Stafford*, we agreed with the Louisiana Supreme Court's conclusion that provisions beginning "the Legislature shall" are non-self-executing provisions; as such, in Louisiana, gambling was legal unless the

Legislature enacted a provision making it illegal. *Stafford*, 114 Mont. at 75-76, 132 P.2d at 701 (citing *Mustachia*, 94 So. at 409).

¶17    Like the Louisiana clause, Montana's Public Schools Clause constitutes a directive to the Legislature: "The legislature shall provide a basic system of free quality public elementary and secondary schools." Since the Public Schools Clause is non-self-executing, it presents a political question which, in the first instance, is directed to the Legislature and is non-justiciable. That determination, however, does not end the inquiry. As here, (1) once the Legislature has acted, or "executed," a provision (2) that implicates individual constitutional rights, courts can determine whether that enactment fulfills the Legislature's constitutional responsibility. *City of Boerne v. Flores* (1997), 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (determining, under the First Amendment, that the Religious Freedom Restoration Act of 1993 violates the Constitution despite Congress specifically implementing the Act through Section 5 of the Fourteenth Amendment, that provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article.").

¶18    Like Section 5 of the Fourteenth Amendment of the United States Constitution, provisions that directly implicate rights guaranteed to individuals under our Constitution are in a category of their own.[1] That is, although the provision may be non-self-executing, thus

---

[1]This contrasts constitutional mandates, for example, that "the legislature shall provide for a Department of Agriculture . . .", Art. XII, Sec. 1, and that "[t]axes shall be levied by general laws [that the Legislature passes] for public purposes," Art. VIII, Sec. 1, 3, neither of which implicates individual rights guaranteed under the Constitution. *See Montana Stockgrowers Ass'n v. Dep't of Revenue* (1989), 238 Mont. 113, 117, 777 P.2d 285, 288; *Kottel v. State*, 2002 MT 278, ¶ 52, 312 Mont. 387, ¶ 52, 60 P.3d 403, ¶ 52.

requiring initial legislative action, the courts, as final interpreters of the Constitution, have the final "obligation to guard, enforce, and protect every right granted or secured by the Constitution . . . ." *Robb v. Connolly* (1884), 111 U.S. 624, 637, 4 S.Ct. 544, 551, 28 L.Ed. 542, 546. Thus the question whether Article X, Section 1(3), presents a "justiciable" controversy cannot be addressed in a vacuum. The clause must be read in the context of any correlative individual rights guaranteed under the Montana Constitution.

¶19 In this case, the requirement that the Legislature shall provide a basic system of free quality public schools, must be read in conjunction with Section 1 of Article X, which guarantees a right to education. *Kaptein ex rel. Kaptein v. Conrad Sch. Dist.* (1997), 281 Mont. 152, 155, 931 P.2d 1311, 1313; *see State ex rel. Bartmess v. Bd. of Trustees* (1986), 223 Mont. 269, 275, 726 P.2d 801, 804-05. In the case *sub judice*, the Legislature has addressed the threshold political question: it has executed Article X, Section 1(3), by creating a basic system of free public schools. As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right. We conclude this issue is justiciable.

### ISSUE TWO

¶20 *Whether the District Court erroneously concluded that the current school funding system violates Article X, Section 1(3), by failing to provide adequate funding for Montana's schools.*

¶21 Article X, Section 1(3), of the Montana Constitution mandates that "[t]he legislature shall provide a basic system of free quality public elementary and secondary schools. . . . It shall fund and distribute in an equitable manner to the school districts the state's share of

7

the cost of the basic elementary and secondary school system." As we have just stated, the Legislature has made an initial policy determination regarding this language. It has created a public school system and a method of funding the system. Although Article X, Section 1(3), is textually committed to the Legislature in the first instance, once the Legislature acts we are not barred from reaching the question of whether the Legislature has fulfilled its constitutional obligation to "provide a basic system of free quality public elementary and secondary schools."

¶22     Although the Legislature *has* made an initial policy determination by establishing a public school system (the relevant consideration under the Political Question Doctrine), it *has not* made a determination as to the meaning of "quality." Because the Constitution mandates that the Legislature provide a quality education, we determine that the Legislature can best construct a "quality" system of education if it first defines what is a "quality" system of education. In addition, even though we here defer to the Legislature as to what constitutes "quality," given the unchallenged findings of the District Court we do conclude that the educational product of the current school system is constitutionally deficient and that the Legislature currently fails to adequately fund Montana's public school system.

¶23     The Montana Legislature created the current education funding system in 1993 with House Bill (HB) 667. The Legislature did so in response to a court challenge to the former system. Unlike in the current proceedings, that challenge was brought under the Equality of Educational Opportunity Clause. Mont. Const. Art. X, Sec. 1(1). We addressed the challenge in *Helena Elementary Sch. Dist. No. 1 v. State* (1989), 236 Mont. 44, 55, 769 P.2d

684, 690, where we concluded that the spending disparities among the State's school districts constituted a denial of equality of educational opportunity as guaranteed by Article X, Section 1(1) of the Montana Constitution.

¶24    HB 667 sought to address those inequities. It did this by relying on a regression analysis designed to address spending and taxing disparities among school districts. Central to the funding system it instituted is the "general fund." The general fund is the largest and most important part of a school district's overall budget. Each school district's general fund budget includes a basic entitlement lump sum from the State, the Average Number Belonging (ANB) entitlement, locally raised funds, and special education funds. A school district's general fund budget has a built-in maximum and minimum, computed using a formula. Tellingly, most school districts currently either exceed their maximum budgets or are budgeting over 98 percent of the 100 percent they are allowed to spend. At trial some educators stated that their districts could not provide what they considered a "quality" education unless they were allowed to spend more than their general fund maximum.

¶25    This funding system is not correlated with any understanding of what constitutes a "quality" education. The evidence for this is two-fold. First, as the State admitted at oral argument, in passing HB 667, the Legislature did not undertake a study of what the Public Schools Clause demands of it. That is, it did not seek to define "quality." As stated above, since the Legislature has not defined "quality" as that term is used in Article X, Section 1(3), we cannot conclude that the current funding system was designed to provide a quality education. Second, as found by the District Court, the Legislature, in creating the spending

9

formula of HB 667, did not link the formula to any factors that might constitute a "quality" education.

¶26    The District Court found that the "major problems" with HB 667 were: it provided no mechanism to deal with inflation; it did not base its numbers on costs such as teacher pay, meeting accreditation standards, fixed costs, or costs of special education; increases in allowable spending were not tied to costs of increased accreditation standards or content and performance standards; relevant data was already two years old when the bill was passed; and no study was undertaken to justify the disparity in ANB dollars dispensed to high schools as compared to elementary schools.  From these credible findings we must conclude that the Legislature did not endeavor to create a school funding system with quality in mind. Unless funding relates to needs such as academic standards, teacher pay, fixed costs, costs of special education, and performance standards, then the funding is not related to the cornerstones of a quality education.  We also note that in *Helena Elementary* we stated that "the accreditation standards establish a minimum upon which quality education can be built" but "do not fully define either the constitutional rights of students or the constitutional responsibilities of the State of Montana for funding its public elementary and secondary schools." *Helena Elementary*, 236 Mont. at 57, 769 P.2d at 692.

¶27    Without an assessment of what constitutes a "quality" education, the Legislature has no reference point from which to relate funding to relevant educational needs.  In the absence of a threshold definition of quality, we cannot conclude that the system is adequately funded as required by Article X, Section 1(3).

¶28 The above analysis is essentially prospective in nature–that is, it states what the Constitution demands of the Legislature and what the Legislature must do to fashion a constitutional education system. Nonetheless, in order to address the Coalition's claims we have to address the *educational product* that the present school system provides, not just the *manner* in which the Legislature funds that school system. Even given the absence of a definition of "quality" education, the District Court's findings demonstrate that whatever legitimate definition of quality that the Legislature may devise, the educational product of the present school system is constitutionally deficient and that the Legislature currently fails to adequately fund Montana's public school system.

¶29 The evidence that the current system is constitutionally deficient includes the following unchallenged findings made by the District Court: school districts increasingly budgeting at or near their maximum budget authority; growing accreditation problems; many qualified educators leaving the state to take advantage of higher salaries and benefits offered elsewhere; the cutting of programs; the deterioration of school buildings and inadequate funds for building repair and for new construction; and increased competition for general fund dollars between special and general education.[2]

¶30 The State counters by arguing that the District Court should have considered output measures, such as test scores, in determining whether the current system is constitutional, and that under such measures Montana compares very favorably with other states. Indeed,

---

[2]Although we conclude that the above-enumerated findings of fact illustrate a constitutionally deficient educational system, we do not necessarily affirm every finding in the District Court's opinion. *See* Order, November 9, 2004, No. 04-390.

Montana's students often do perform quite well on standardized achievement tests. However, current test scores do not tell the whole story. First of all, a "system" of education includes more than high achievement on standardized tests. We have noted elsewhere, for example, that school districts have an interest in integrating their academic programs with extracurricular activities. *Kaptein*, 281 Mont. at 162, 931 P.2d at 1317. Secondly, it may be that test scores are not attributable to the current educational system. The voluminous evidence presented at trial and summarized in the preceding paragraph established that although Montana's students are testing well when compared with students in similar states, there are serious concerns as to whether this level of achievement will continue. With the District Court's findings of fact in mind, it may be that the achievement registered by Montana's students is not *because* of the current educational system.

¶31 Therefore, because the Legislature has not defined what "quality" means we cannot conclude that the current system is designed to provide a "quality" education. Article X, Section 1(3), explicitly requires the Legislature to fund a "quality" educational system. Therefore we defer to the Legislature to provide a threshold definition of what the Public Schools Clause requires. We also conclude, however, that given the unchallenged findings made by the District Court, whatever definition the Legislature devises, the current funding system is not grounded in principles of quality, and cannot be deemed constitutionally sufficient.

**ISSUE THREE**

¶32    *Whether the District Court erred in concluding that the State has violated Article X, Section 1(3), by not paying its share of the cost of the public school system.*

¶33    In light of our holding on issue number two above, we decline to address this issue.

## ISSUE FOUR

¶34    *Whether the District Court erred in concluding that the State has violated Article X, Section 1(2), by not recognizing the cultural heritage of American Indians in its educational goals.*

¶35    The District Court concluded that the State has failed to recognize the distinct and unique cultural heritage of American Indians and that it has shown no commitment in its educational goals to the preservation of Indian cultural identity, as demanded by Article X, Section 1(2). It relied on our opinion in *Helena Elementary*, when we held that the "provision establishes a special burden in Montana for the education of American Indian children which must be addressed as part of the school funding issues." *Helena Elementary*, 236 Mont. at 58, 769 P.2d at 693. The State does not contest these conclusions. "This Court will not endeavor to review a matter when appellant has directed no argument toward it." *Sands v. Nestegard* (1982), 198 Mont. 421, 428, 646 P.2d 1189, 1193. Therefore, we merely recognize that the findings and conclusions of the District Court regarding Article X, Section 1(2), of the Montana Constitution stand unchallenged.

## ISSUE FIVE

¶36    *Whether the October 2005 effective date of the District Court's opinion should be moved up to May 2005.*

13

¶37    We affirm the District's Court's selection of October 1, 2005, as the effective date of its order.

## ISSUE SIX

¶38    *Whether the current school funding system violates the Equal Protection Clause of the Montana Constitution.*

¶39    The District Court concluded that the present system violates Article X, Section 1(3), of the Montana Constitution (basic system of free quality public schools), but not Article II, Section 4 (equal protection).  Since we have concluded that the present system violates Article X, Section 1(3), we need not address the question of whether the system complies with the Equal Protection Clause of Article II, Section 4.  *See Helena Elementary*, 236 Mont. at 55, 769 P.2d at 691.  Similarly, when the District Court concluded that the present system violates Article X, Section 1(3), it need not have addressed the Coalition's equal protection claim.  Accordingly, we direct the District Court to vacate its conclusion that the system does not violate the Equal Protection Clause of Article II, Section 4, of the Montana Constitution.

## ISSUE SEVEN

¶40    *Whether an award of attorney fees is appropriate.*

¶41    The District Court denied an award of attorney fees to the Coalition, citing our denial of attorney fees in *Helena Elementary*, 236 Mont. at 58-59, 769 P.2d at 693.  It is true that we denied attorney fees in that case.  However, as the Coalition correctly points out, our decision there was based on the "common fund" doctrine.  Since *Helena Elementary*, we decided *Montanans for the Responsible Use of the School Trust v. State ex rel. Board of*

14

*Land Commissioners*, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67 (*Montrust*).  In *Montrust* we awarded attorney fees pursuant to the private attorney general doctrine.  The District Court erred in not addressing this change in our attorney fees jurisprudence.  Therefore, we vacate the District Court's denial of attorney fees and remand for reconsideration in light of *Montrust*.

/S/ W. WILLIAM LEAPHART

We Concur:

/S/ PATRICIA O. COTTER

/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ DAVID RICE
Honorable David Rice, District Judge,
sitting for former Justice Jim Regnier

Justice Jim Nelson concurs.

¶42     I concur in our Opinion, although I perceive a need for further remarks regarding our power to enforce non-self-executing constitutional rights.

¶43     First, in *General Agric. Corp. v. Moore* (1975), 166 Mont. 510, 534 P.2d 859, our view of what sort of provision is and is not self-executing was softened somewhat from the definition we adopted in *State ex rel. Stafford v. Fox-Great Falls Theatre Corp.* (1942), 114 Mont. 52, 132 P.2d 689.  In *General Agric.*, we stated:

> "A provision is self-executing when it can be given effect without the aid of legislation and there is nothing to indicate that legislation is contemplated in order to render it operative. . . .  The fact that a right granted by a constitutional provision may be better or further protected by supplementary legislation does not of itself prevent the provision in question from being self-executing; nor does the self-executing character of a constitutional provision necessarily preclude legislation for the better protection of the right secured, or legislation in furtherance of the purposes, or of the enforcement, of the provision."

*General Agric.*, 166 Mont. at 514, 534 P.2d at 862.  Accordingly, I am not necessarily of the view that constitutional provisions beginning with the words "the legislature shall" must all be denominated as non-self-executing.  *See* Cameron Carter and Kyle Karinen, Note, *A Question of Intent:  The Montana Constitution, Environmental Rights, and the MEIC Decision*, 22 Pub. Land & Resources L. Rev. 97, 119-21 (2001) (hereinafter *Carter*).  *But see* John L. Horwich, *Montana's Constitutional Environmental Quality Provisions: Self-Execution or Self-Delusion?*, 57 Mont. L. Rev. 323 (1996).

16

¶44 Second, with the exception of rights protected under Article II of the Montana Constitution[1], there are those who might read our Opinion as suggesting that the legislature must always act upon a non-self-executing constitutional directive before a justiciable claim arises regarding the implementation of that provision. This raises a question: if the legislature fails or refuses to implement a non-self-executing constitutional directive, may a justiciable claim regarding the proper implementation of that clause eventually ripen?

¶45 As early as 1900, this Court considered the problem posed by legislative inaction with respect to non-self-executing clauses. The case of *State ex rel. Whiteside v. First Judicial Dist. Ct.* (1900), 24 Mont. 539, 63 P. 395, dealt with the Court's constitutionally granted power of supervisory control as established in Article VIII, Section 2 of the 1889 Constitution. This section provided that such power was to be exercised "under such regulations and limitations as may be prescribed by law." The Court questioned whether the power of supervisory control would be dormant in the absence of legislation indicating specific procedures for the exercise of that power. While acknowledging that such legislative inaction would represent an ostensible limitation on the *exercise* this power, the Court flatly rejected the notion that such a constitutionally granted power could be rendered ineffective by the legislature's failure to enact guidelines for its use. *Whiteside*, 24 Mont. at 563, 63 P. at 400. In doing so, the Court noted that "the legislature cannot decrease the powers granted by the Constitution." *Whiteside*, 24 Mont. at 563, 63 P. at 400. This view

---

[1] *See* ¶ 18 and n.1, *infra*.

17

pays due respect to the paramount nature and inherently positive force of constitutionally established powers, as well as constitutionally granted rights.

¶46 When, in adopting their constitution, the people provided that a provision shall be implemented by the legislature, it cannot be gainsaid that the people had the right to expect, and do expect that branch of government to, in good faith, carry out its constitutionally imposed obligation to legislate. In truth, non-self-executing constitutional directives may be, for all intents and purposes, nullified by a legislature which chooses to ignore such directives. Simply put, non-self-executing clauses, whether delineating a power or establishing a right, are not rendered ineffective by a legislative failure to enact laws in furtherance of such clauses.

¶47 Other courts have recognized this principle, as well. For example, the Florida Supreme Court has stated:

> The will of the people is paramount in determining whether a constitutional provision is self-executing and the modern doctrine favors the presumption that constitutional provisions are intended to be self-operating. This is so because in the absence of such presumption the legislature would have the power to nullify the will of the people expressed in their constitution, the most sacrosanct of all expressions of the people.

*Gray v. Bryant* (Fla. 1960), 125 So. 2d 846, 851. Similarly, the Arizona Supreme Court has stated:

> "The general presumption of law is that all constitutional provisions are self-executing, and are to be interpreted as such, rather than requiring further legislation, for the reason that, unless such were done, it would be in the power of the Legislature to practically nullify a fundamental of legislation."

*Morgan v. Board of Sup'rs* (Ariz. 1948), 192 P.2d 236, 241. *See also Carter* at 116-17.

18

¶48    Starting with the assumption, as does our Opinion, that non-self-executing constitutional mandates are, by their very nature, enacted with the expectation that the legislature will act to implement the directive, a justiciable claim must, at some point, arise if the legislature fails or refuses to fulfill its obligation.  Indeed, choosing not to act, is an act in and of itself.  *See State v. Weaver* (1996), 276 Mont. 505, 509, 917 P.2d 437, 440 (a court's failure to exercise its discretion is, in itself, an abuse of discretion (citations omitted)); *State ex rel. Westercamp v. State Bd. of Chiropractic Exam'rs* (1960), 137 Mont. 451, 457, 352 P.2d 995, 999 (board's manifest abuse of discretion amounts to a failure to act at all).

¶49    The only real question is, at what point in time is there an unacceptable failure or refusal?  I submit that that issue is best resolved on a case-by-case basis, taking into consideration the nature of the right, the length of time during which the legislature has failed or has refused to act, and the reason for its failure or refusal to legislate.

¶50    Where the legislature fails or refuses to fulfill in its constitutional obligation to implement a non-self-executing constitutional right, and that failure or refusal is challenged in court, then it will necessarily fall to the courts to protect the right at least to the extent that the facts of the case require.  Constitutional rights that cannot be enforced are illusory.  It is as if those rights cease to exist as legal rights.  *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 58, 310 Mont. 123, ¶ 58, 54 P.3d 1, ¶ 58 (Nelson, J. concurring).

¶51    Put another way, legislation which would defeat or restrict a self-executing mandate of the constitution is beyond the power of the legislature to enact.  *Broderick v. Weinsier*

19

(N.Y. 1938), 16 N.E.2d 387, 388. Similarly, it follows, that a legislative failure to act upon a non-self-executing constitutional directive, which defeats or restricts the purpose of that mandate, is just as unacceptable as legislation which defeats or restricts the purpose of a self-executing right. Were that not so, the people could be and would be effectively stripped of important constitutional guarantees and protections by default.

¶52    As we stated in *General Agric.*:

> The supremacy of constitutional mandates is too well established to require citation. . . . "A written constitution is not only the direct and basic expression of the sovereign will, it is also the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it, and must control as it is written until it is changed by the authority which established it. No function of government can be discharged in disregard of or in opposition to the fundamental law. The state constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates, and the legislature, the executive officers, and the judiciary cannot lawfully act beyond its limitations."

*General Agric.*, 166 Mont. at 515-16, 534 P.2d at 862-63.

¶53    Indeed, no branch of government has, in default of its constitutional obligation to act, the power to, *de facto*, write out of the constitution important rights and guarantees which the people sought to secure unto themselves, believing when they did so, that their elected officials would, in good faith, honor their command.

¶54    With those caveats, I concur.

/S/ JAMES C. NELSON

20

Justice Patricia O. Cotter joins in the concurrence of Justice James C. Nelson.


                                         /S/ PATRICIA O. COTTER

Justice Jim Rice specially concurring.

¶55     I concur with the holding of the Court on all issues and write to offer alternative reasoning for affirming the District Court on Issues 1 and 2.

¶56     The State's argument that this is a political question reserved for the Legislature is well supported by case authority from other states. However, I agree with the Court's resolution and would add that this question was essentially resolved sixteen years ago by *Helena Elementary Sch. Dist. No. 1 v. State* (1989), 236 Mont. 44, 769 P.2d 684, wherein the Court first undertook judicial review of the constitutional issues related to school funding under the 1972 Montana Constitution. School funding has been analyzed pursuant to that decision ever since. It may have been more appropriate for the State to raise the political question defense at that time, but, in any event, I believe the Court's decision is clearly consistent with the expectations of the Constitutional Convention delegates, who rejected an amendment which would have placed school funding within the exclusive province of the Legislature, offered by Delegate McDonough:

> [W]hat is distribution in an "equitable manner"; and what is "full funding" of the educational program? Now, that should be left with the Legislature and the Legislature only, and nobody else. They're the representatives of the people up here to decide fiscal matters, not the Supreme Court of Montana and not anybody else. It's the Legislature that has this power, and the Legislature should have it.
>
> . . . .
>
> . . . There's going to be problems from time to time, but if you leave [the words] in as they are now worded, you're going to have more problems

22

of constitutional–legal construction on any lawsuits relative to the application of these last two sentences [of Article X, Section 1(3)].

Mont. Const. Conv. Tr., Vol. VI at 1963. The delegates' rejection of the proposed amendment set the Constitution on a course that would make Delegate McDonough's observations prescient: school funding was made an issue of constitutional dimension which requires the involvement, within their respective spheres, of both the legislative and judicial branches in order to resolve "problems of constitutional–legal construction."

¶57 Turning to the substance of school funding under Issue 2, the Court concludes that "the Legislature can best construct a 'quality' system of education if it first defines what is a 'quality' system of education" based upon educationally relevant factors. *See* ¶ 22. This is undoubtedly logical, but I would nonetheless refrain from suggesting how to "best construct" the educational system, and upon what factors it must do so, believing it to be an inappropriate judicial comment on the Legislature's prerogative, if I was not convinced that the "suggestion" was, in fact, constitutionally compelled. Truly, the debates of the delegates demonstrate that, in assigning to the Legislature the task of designing the system, they intended the Legislature to assess the educational needs of the state before deciding funding issues. "*After the state has assessed the needs* and established what a minimum program ought to be, we feel that the state ought then to provide, by whatever means it sees fit, for the funding of the program."[1] "*Once the needs* for a basic quality system of elementary and

---

[1]Delegate Harbaugh, Mont. Const. Conv. Tr., Vol. VI at 1961 (emphasis added).

secondary schools have been *realistically assessed*, the state has the obligation to guarantee . . . ."[2]

¶58 Clearly, the power to determine what constitutes a quality system was granted to the Legislature. "We are saying to the Legislature, 'We have untied your hands. We want you to set up a basic elementary and secondary education. You have full power to decide what that is going to be; but when you get it done, the state's share of it, as you determine it'–we give the Legislature full power there to determine its share, too–we haven't tied their hands–'shall be funded . . . .'"[3] Based on these indications from the delegates, I concur that the Court's directives–to define a quality system based upon relevant factors–are appropriately given.

¶59 I agree with the Court's focus on the word "quality," but the Constitution also uses two other important terms in regard to educational funding requirements–"basic" and "state share." These terms are employed to shape the Legislature's duty with regard to educational funding. "Basic" occurs twice in describing the system the Legislature must create. Extensive explanation of the meaning of "basic" was given by Delegate Habedank, who offered the motion to add the term to the Constitution in these two places. In summary, the intention was:

---

[2]Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 1962 (quoting committee comments) (emphasis added).

[3]Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 2153.

[T]o require the Legislature to do full funding of a basic educational program and that the frills and the things beyond the basic program, as the Legislature determines it, can still remain with the people.

. . . .

. . . [T]he public is concerned. They are very concerned. And the delegation here . . . evidenced its concern about educational theorists coming in with every type of–shall we call it "screwball education proposal" and insisting that this be in here, and it was felt that "basic" would help.

Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 1962, 2154.

¶60 Next, the delegates inserted "state share" into the Constitution to further define the Legislature's obligation. The first sentence of Article X, Section 1(3), states that the Legislature "shall provide a basic system of free quality public" schools. The third sentence of this section states that the Legislature "shall fund . . . the state's share" of the cost of this basic system. From these provisions we understand that the Legislature must "provide"– to establish or make available–a basic system of quality education, but that the Legislature must "fund" only the "state's share" of this system. Indeed, the District Court concluded that "the State is not paying *its share* of the cost of the basic elementary and secondary school system." (Emphasis added.)

¶61 These provisions of the Constitution arose out of the delegates' concern that the Legislature had historically failed to fully fund the Foundation Program, the then-existing vehicle for state support of public education, or state share. ("It is only when our state Legislature fails to meet the obligation under the foundation program that we begin to get these real inequities built into it. For instance, the state right now is funding only about 65

percent, and the other 35 percent has to go back on local property tax levies."[4]) Although acknowledging that other revenue sources, including local levies, were also necessary in order to fund a basic system of *quality* education, the intent was to require the Legislature to fund only the state's share of that cost:

> I think there's fear here that we're asking the state to do all of the financing for education. This is not what we're trying to do. I think what we're trying to do here is to do what the foundation program has not done. I don't think we're trying to eliminate levies at the local level. I don't foresee this, and I would hate to see it come. I think at the local level, still there should be ability–or the people should be able to have a higher quality of education [than] in some other community. And I really think the underlying fear here is that the state is going to provide the total financing, and this is not true. We're asking for the full funding [of the foundation program]; and when we're asking that, we're talking, really, in the sense that we have in the past in this area.

Delegate Woodmansey, Mont. Const. Conv. Tr., Vol. VI at 1968.

> I think it's also essential that the Legislature should have the power to require school districts to tax for a portion of their educational program in order to keep control of education at a local level, in order to allow people to know what is being spent for education, and this is what my proposal also does.

Delegate Habedank, Mont. Const. Conv. Tr., Vol. VI at 2153.

¶62 In my view, the District Court's conclusion that school funding is constitutionally inadequate is supported primarily by the evidence demonstrating that the system has once again fallen into the condition criticized by the delegates, and against which they reacted– namely, that the state's share of the cost of education has steadily eroded to the point of insufficiency. This condition was also critically noted by the Court in *Helena Elementary*. *Helena Elementary*, 236 Mont. at 55, 769 P.2d at 690. In inflation-adjusted dollars, state aid

---

[4]Delegate Blaylock, Mont. Const. Conv. Tr., Vol. VI at 2157.

26

declined between 1991 and 2003 by 17 percent, and local taxes have increased by 120 percent to pay for the cost of education. The state share of the general fund declined to 60.95 percent in 2003. Thus, while the funding system created under HB 667 addressed the constitutional problem caused by disparities in funding between school districts–the primary issue in *Helena Elementary*–it nonetheless failed, over time, to maintain state support and satisfy the state's duty to fund its share of education, thus running afoul of a separate constitutional mandate. The evidentiary focus on such factors as deterioration of school buildings and the departure of educators is appropriate in assessing the health of the system, but such factors are merely symptoms of the underlying disease: the state's failure to fully fund its share of educational costs. This is a long term, systemic and fundamental flaw which I believe violates the last sentence of Article X, Section 1(3).[5]

¶63 In conclusion, the Court has noted that this decision stands on its own and does not necessarily affirm the entirety of the District Court's order. The District Court's yeoman efforts are to be saluted, and we simply do not have time to address each matter ruled upon in its lengthy decision. I would make one exception and offer comment thereon. In Finding of Fact No. 186, the District Court found that the constitutional mandate to the Legislature

_____

[5]Neither is it inappropriate for the state to draw attention to output measures such as test scores. This is evidence which supports the testimony of several school officials that they are continuing to provide a "quality" education despite funding difficulties. However, like the Court, I believe that test scores do not tell the full story. I disagree only with the Court's statement that "it may be" that high test scores were not achieved because of the current system. *See* ¶ 30. That statement is speculative; but further, I believe our schools and the state are entitled to take credit for this positive achievement as one produced by the current system.

does not depend on the state's fiscal capacity, citing *Helena Elementary*. However, in *Helena Elementary*, we found "unpersuasive the argument that statewide fiscal difficulties in the last few years somehow excuse the disparities in the spending per pupil in the various school districts." *Helena Elementary*, 236 Mont. at 54, 769 P.2d at 690. In other words, limited resources did not excuse the unequal distribution of those resources. That is not the problem here. While legislators cannot avoid school funding problems because of financial concerns, it should also be stated that the school funding obligation, as with any financial obligation, even one of constitutional dimension, is necessarily circumscribed by the State's "fiscal capacity." Indeed, this was acknowledged by the delegates: "the committee realizes that economic resources of the state limit this [educational] goal."[6]

¶64    The extensive quotations from the transcripts of the constitutional convention herein are made with the understanding that the statement or intention of one delegate does not necessarily equate with the intention of the delegates as a body or of the Great Work they created. However, a comparison of the words of the Constitution with a study of the entirety of the debates allows one to glean the delegates' intentions with regard to the issue of educational funding with, in my view, a high degree of confidence. I believe the quotations herein accurately reflect those intentions.

---

[6]Delegate Harbaugh, Mont. Const. Conv. Tr., Vol. VI at 1949-50.

28

¶65    I concur.


/S/ JIM RICE


Chief Justice Karla M. Gray joins in the special concurring opinion of Justice Rice.


/S/ KARLA M. GRAY